R. L. Brent *et al. v.* B. E. Brister Sawmill Company *et al.*

[60 South. 1018.]

1. Corporations. *Receivers for solvent corporations. Appointment. Discretion.*

　　The chancery court has the jurisdiction to appoint a receiver for a going and solvent corporation at the instance of the minority stockholders on a showing of maladministration, to take charge of the business of the corporation, and if it is shown to the court to be necessary, to wind up such business.

2. Receivers. *Appointment. Discretion.*

　　The matter of the appointment of a receiver *pendente lite,* as well as a receiver generally, is committed to the sound discretion of the court. The necessity for such an appointment should be clear, and the court in making it should move with due care and in full consideration of the interest of all parties concerned.

APPEAL from the chancery court of Lincoln county.
HON. G. G. LYELL, Chancellor.

Suit by R. L. Brent and others, stockholders, against
the B. E. Brister Sawmill Company and others, officers,
directors, and creditors. From a judgment sustaining a
demurrer to the bill, complainants appeal.

The facts are fully stated in the opinion of the court.

*Green & Green, H. Cassedy* and *J. N. Yawn,* attorneys
for appellants.

Right of a stockholder to maintain a bill to dissolve
the corporation and distribute the assets. On this one
proposition, we call the attention of the court to *Noble*
v. *Gadsen Land & Improvement Co.,* 133 Ala. 250, 31
So. 586, 91 Am. St. Rep. 27, and note; also, *Exchange
Bank* v. *Barley,* 39 L. R. A. (N. S.) 1032, and note.

We take the liberty of copying in full the note of Mr.
Freeman on this interesting topic, which contains nu-
merous authorities, some of which have been cited al-
ready. For brevity we do not copy in the authorities, as
in fact, the reasoning is so sound, and the note so fraught
with good sense that the text proves itself; illustrating
the modern doctrine, Mr. Freeman says:

The general rule is often laid down that a court of
equity in the absence of statutory authority has no ju-
risdiction to dissolve a corporation and distribute its
assets among the stockholders at the suit of one or more
of them. The reason given for this rule is, that since
the corporation owes its life to the sovereign power, its
dissolution and the termination of its existence can be
worked only by the state in a proper proceeding in sti-
tuted in its behalf. There is much force to this reason
in the case of *quasi* public corporations, and it may have
had some validity as applied to all corporations at the
time when valuable and exclusive franchises were granted
by special legislative acts; but now, when corporations
are organized under general laws, and the privilege of

organization is open to all who comply with the require-
ments of the statute, it is entirely theoretical and with-
out merit.   Corporations established for objects *quasi*
public, such as railway and telegraph companies, may
well be within this rule; and so, also, may charitable and
religious societies in the administration of whose affairs
the community, or a part of the community, has an in-
terest in their corporate duties being properly dis-
charged.   Not so, however, with corporations of a pri-
vate character, established solely for trading, manufact-
uring, or the like.   Neither the public nor the legislature
has any direct interest in their business or its manage-
ment.   These are committed to the stockholders, who
have a pecuniary interest in the conduct of their affairs.
They do not, by accepting a charter, undertake to carry
on the business for which they are incorporated indefi-
nitely, and without regard to the condition of the cor-
porate property and affairs.   Public policy does not re-
quire that they continue the existence of the concern at
a loss.   On the contrary, it is clearly for the public wel-
fare that the corporation should cease to exist as soon
as it appears that it cannot prudently be continued.

"There is no doubt of the right of a corporation, or-
ganized solely for private emolument and owing no duty
directly to the public, by a vote of a majority of the
stockholders, to dispose of its property, distribute its as-
sets among its shareholders and go out of the business,
when to do so is plainly for the best interest of all.   The
objections of the minority will be unavailing, provided
the majority acts in good faith and the business can no
longer be advantageously carried on.   It would be a harsh
and unreasonable rule that would permit one stockholder
to hold the others to their investment when just cause
exists for closing the corporate business.

"Nor is this right confined to the majority.   When it
has become impossible to accomplish the chartered pur-
poses of the corporation, or when its affairs have been

so mismanaged that failure or ruin is inevitable, it would be a reproach on the administration of justice if a court of equity, on the application of a stockholder, or a minority of the stockholders, could not etxend relief and this without any express statutory authority. Of course, if stockholders disapprove of the company's management, which is conducted fairly and legitimately, their remedy is to elect new officers or sell their stock and withdraw. When the question is one of mere discretion in the management of the business or of doubtful event in the undertaking in which the concern has embarked, a remedy cannot be sought in a court of equity. On the other hand, if it plainly appears that the object for which the company was formed is impossible, it becomes the duty of the company's agents to put an end to its operations and wind up its affairs; and should they, though supported by a majority of the stockholders, pursue operations which must be eventually ruinous, or should the enterprise be abandoned as impossible of realization, any shareholder would, upon plain equitable principles, be entitled to the assistance of a court of equity, and a decree should be rendered compelling the directors to wind up the company's business and distribute its assets among those entitled to them.

"This course is pursued in case of partnerships in similar situation, and 'there is nothing in the character of a trading corporation to prevent the application of this remedy.' It is, after all, as between the stockholders, nothing more than a trading copartnership. Chancellor WALWORTH says that 'joint stock corporations are mere partnerships, except in form; the directors are the trustees or managing partners, and the stockholders are the *cestuis que trust,* and have a joint interest in all the property and effects of the corporation,' and HINMAN, C. J., says: 'Joint stock companies in modern times are nothing but commercial partnerships, which have taken the form of corporations for the greater facility of trans-

acting business.' *Fongeray* v. *Cord,* 50 N. J. Eq. 185, 24 Atl. 499. 'A case might occur,' remarks Lord CAIRNS, 'where the court would be willing to give, under the act, to a minority of shareholders the species of relief that sometimes is given in cases of ordinary partnership where it becomes impossible (I use the word impossible in the strict sense of the term) to carry on the business any longer. . . . It is not necessary now to decide it; but if it were shown to the court that the whole substratum of the partnership, the whole business which the company was incorporated to carry on has become impossible, I apprehend that the court might, either under the act of parliament, or on general principles, order the company to be wound up. But what I am prepared to hold is this, that this court, and the winding up process of the court, cannot be used as the means of evoking a judicial decision as to the probable success or non-success of a company as a commercial speculation.' *In re Suburban Hotel Co.,* L. R., 2 Ch. App. Cas. 737.

"While a court of equity may, at the suit of a stockholder, distribute the assets of a corporation among the shareholders and wind up the business, its power to extinguish the franchise or terminate the legal existence of the corporation is not so clear. Probably in most cases the rights of the complainants can be fully subserved without going to this length; yet, if the exigencies of any case demand such measures, we incline to the view of Mr. Justice TYSON, in the principal case, that a court of equity has jurisdiction to dissolve the corporation. The objection that the corporate franchise was granted by the state is purely technical, and should be no insuperable obstable to relief if good cause is shown. Perhaps the question is of little practical importance anyhow, since when the corporation is stripped of its property and assets, its existence is virtually at an end." End of note.

In dealing with private corporations, the courts are fast departing from the idea that their affairs cannot

be inquired into and justice done to the parties in interest the same as if they were partnerships. The Mississippi supreme court holds that corporations can make general assignments for the benefit of creditors; that where public money demands, they will not be looked upon as separate entities, but the stockholders will be taken into consideration. In the national bankruptcy acts corporations were excluded from the benefit of such acts until in the past few years when congress included private corporations, except banks. There has been a departure from the old, narrow, hard, unjust lines. By making a general assignment, or disposing of all of its property, or by insolvency and the administration of its affairs for the creditors, the result has been the dissolution of the corporation for all practical purposes; and these things have been done in Mississippi, though not at the suit of a minority stockholder who was praying for the protection of his interests while he yet had interests to protect.

*Brady & Dean,* attorneys for appellee.

With regard to the creditors, about whom appellants agonize so frequently, and anticipating that appellants may seek to make capital of an "exploratory" question propounded orally to counsel for appellees on the hearing of another issue in this cause, in effect as follows:

"Would not a minority stockholder have the right to attack the validity of a void deed in trust, which rendered the property of the corporation liable to attachment?"

Appellees show that the attorney for the complainants wrote a personal appeal (as shown by the record) to each of the creditors of B. E. Brister Sawmill Company, soliciting them to join in the litigation against the corporation, and they refused to do so, without exception, so that not only the question asked by the learned justice, but all other questions wherein unsecured creditors of

the corporation are concerned are effectually and finally eliminated from consideration in this controversy. See, also, *Williams* v. *Neville, supra.*

With regard to the right of the minority of the stock- holders to attack a deed of trust as affecting their own interests, precisely the same arguments apply as were made in the case of the two banks. See, also, the cita- tions on page 10 of this brief, and 10 Cyc., pp. 1065- 1068 and 1156-1167, as cited on page 12 of this brief. See especially *McIver* v. *Abernathy et al.,* 5 So. 519, and *Watts Mercantile Company* v. *Buchannan,* 46 So. 66. On page 67 of the latter case this court said:

"However, we need not bother about this, but prefer to plant ourselves, in the particular case before us, in the decisions of various courts, notably, New York, Mas- sachusetts, and Wisconsin, and on the language of the New York court that 'that kind of plunder which holds onto the property, but pleads the doctrine of *ultra vires* against the obligation to pay for it, has no recognition or support in the laws of this state.' "

If appellants say that because they got nothing back from the corporation in dividends, that, therefore, they are not estopped to attack the deeds in trust by which the corporation got money, they are in no better case. The corporation is not shown to be insolvent; they are now opposed by the majority; they have no right to speak for the corporation, but are bound by the action of the majority. See *Gumaer* v. *Cripple Creek, etc., Co.,* 40 Colo. 1, 13 Ann. Cas. 781. If appellants have any cause of action it is certainly not against this appellee, and as regards those appellees not included in this brief, we are prepared to volunteer the assertion that they have no cause of action whatever.

What cause of complaint have appellants as to Louis Werner Sawmill Company? They do not deny that the corporation got the money; an almost full meeting of its directors unanimously authorized its president to se-

cure this large debtor by mortgaging all of the property; one of complainants and appellants voted for this resolution with the rest. What then? ''But the president executed three deeds in trust, and the corporate property will be sacrificed should the deeds be foreclosed!'' Suppose that were true, could appellants equitably do less than suggest the execution of one deed in trust, in line with the authority extended to the president? They do not want to do equity, but seek to retain the plunder and cancel the obligation. They have been defrauded of nothing by this appellee, and have no cause of action against it, nor stated any.

Appellants' attitude, with respect to Capital National Bank, Citizens Savings Bank & Trust Company and Louis Werner Sawmill Company, as shown by the bill of complaint filed below, as amended, with exhibits, can be summed up in a very few words: They come unto a court of equity with filthy hands—and without a leg to stand on.

*Jones & Tyler,* attorneys for appellees.

Counsel for appellants have filed a supplemental brief to the one proposition involving the right of a minority stockholder to maintain a bill to dissolve a corporation and distribute the assets. In the supplemental brief they cite the court to the case of *Noble* v. *Gadsden Land & Improvement Co.,* 31 So. 586, 91 Am. St. Rep. 27.

This case was cited and quoted from in our original brief, as tending to show the extent of the modification of the general rule by the Alabama courts. The attention of the court was also directed by us to a statute of Alabama conferring jurisdiction upon the chancery court to dissolve corporations and distribute their assets. While, as stated in the original brief, the opinion of the court in that case was apparently without reference to the statute, however, the statutory authority does not exist in that jurisdiction, and it might be stated

that whatever the court may have said as to the inherent power of the court in the absence of statute was *obiter dicta* and not necessary to a decision of the case.

Counsel in their supplemental brief quoted in full the note of Mr. Freeman to this case as reported in 91 Am. St. Rep. ——. In our judgment this note does not in any respect affect our contention, that even though the court may, in certain cases, take charge of, sell and dispose of the assets of a corporation and wind up the corporate affairs, yet the case presented, by the facts well pleaded in appellant's bill of complaint, does not fall within such exception. Mr. Freeman lays down the rule that this can be done in a court of chancery, provided it is manifest that the purposes for which the corporation was created have become, for some cause, impossible of attainment, and that is the extent of the holding by Mr. Justice TYSON in the principle case. Manifestly the appellee's business can be continued with over three hundred and twenty-five million feet of timber now owned by it.

In our judgment the law is that a chancery court, in Mississippi has no authority to wind up and dissolve a solvent, going concern, and, in our view, none of the authorities cited by appellants' counsel sustain the doctrine to the contrary, except possibly, the Durham Tobacco Company case, referred to in our original brief. In this connection we call the court's attention to the remarks of Lord CAIRNS, quoted in appellants' supplemental brief, as follows:

"Where the court would be willing to give, under the act to a minority of shareholders the species of relief that sometimes is given in cases of an ordinary partnership where it becomes impossible (I use the word impossible in the strictest sense of the term) to carry on the business any longer. It is not necessary now to decide it; but if it were shown to the court that the whole substratum of the partnership, the whole business which

the company was incorporated to carry on has become impossible. I apprehend that the court might, either under the act of parliament, or on general principles, order the company to be wound up. But what I am prepared to hold is this, that this court, and the winding up process of the court cannot be used, and ought not to be used, as the means of evoking a judicial decision as to the probable success or nonsuccess of a company as a commercial speculation.''

So we again submit that no authority has been cited to sustain the position of the appellants in this case.

We might suggest in this connection, that there is now pending before the present session of the legislature, an act to confer jurisdiction upon chancery courts to wind up and dissolve corporations, being known as senate bill No. 330, which has, we understand, been passed in the senate. While we have not seen this act we are constrained to believe that even the legislature has not seen proper to undertake to provide for the dissolution of a solvent, going corporation, contrary to the wishes and desires of a majority of the stockholders; but whatever the provisions of that act may be, it but strengthens our contention that under the law as it existed at the time this suit was filed and now exists, in this state, no such power rests with the court. The legislature is pursuing a course, which, in our view, is necessary to change the rule on this question.

Argued orally by *Hiram Cassedy,* for appellants and *P. Z. Jones* and *T. Brady,* for the appellees.

REED, J., delivered the opinion of the court.

This case is before us upon an appeal from the decrees of the chancery court sustaining the demurrers of appellees, B. E. Brister Sawmill Company, Louis Werner Sawmill Company, Citizens' Savings Bank & Trust Company, and Capital National Bank. The question for our

consideration is whether a court of equity in this state, at the instance of minority stockholders, can appoint a receiver for a going and solvent corporation and wind up its affairs.

The following is shown by the original bill and the amendment thereto: The bill is filed by two of the directors and six other stockholders of the B. E. Brister Sawmill Company. At the time of the filing of the bill two of the stockholders were also creditors, but since then the indebtedness due each has been paid, and when the demurrers were heard the complainants were only stockholders and directors. The business, which had been conducted for some years as a copartnership, was incorporated April 27, 1904. The property of the firm, with the exception of a mercantile business, was thereupon conveyed to the company. The mercantile business was organized into a separate company. The capital stock of the sawmill company was fixed at two hundred thousand dollars, and was divided between the three copartners of the business, as follows: B. E. Brister, eight hundred shares, I. V. Brister, six hundred shares, and Mrs. Julia Brister, six hundred shares. Mrs. Julia Brister divided a large part of her stock among her children. A portion of the stock was afterwards transferred to F. F. Becker. The stock of I. V. Brister was transferred by him to his brother, B. E. Brister, after the present suit was brought, and B. E. Brister transferred some of his shares to his wife. Since the organization of the company B. E. Brister has been the president and general manager, and, with his brother and wife, held the majority of the stock, and constituted a majority of the board of directors.

It is charged in the bill that at the beginning of the corporation the company's books showed that it owned property to the value of eight hundred and forty-eight thousand, six hundred and thirty-two dollars and forty-two cents; that the capital stock was two hundred thou-

sand dollars, and that the company owed one hundred
and sixty one thousand, seven hundred and forty-six dol-
lars and thirty cents, leaving a surplus of four hundred
and eighty-six thousand, eight hundred and eighty-six
dollars and twelve cents; that after six years' operation
there was a shrinkage in the value of the company's
property of three hundred and twenty-five thousand,
three hundred and eight dollars, and fifty-four cents, and
an increase in the liabilities of one hundred and forty-six
thousand, nine hundred and eighty dollars and forty-
seven cents. It is shown that after much effort, and
after the filing of the original bill, appellants arranged
for an accountant to go over the books of the company
for information as to its condition, and that the report
of this accuntant showed that on December 31, 1910, the
surplus and undivided profits had been reduced to four-
teen thousand, five hundred and ninety-seven dollars and
seventeen cents; that at the time of the filing of the bill
the property of the company was incumbered by deeds
of trust amounting to apparently about one hundred and
fifty thousand dollars, all past due; of this amount one
hundred thousand dollars was in favor of the Louis Wer-
ner Sawmill Company, and the remaining secured indebt-
edness in favor of the Citizens' Savings Bank & Trust
Company and the Capital National Bank.

It is charged that the president and general manager
of the company failed and refused to give the proper
and definite information of the affairs of the company,
and that at a meeting of the stockholders the majority
voted down the proposition to have the books of the com-
pany audited; that the minority stockholders were una-
ble to obtain from the president any information about
the land and timber of the company, and that at a meet-
ing their proposition to have the timber cruised so that
an intelligent and accurate statement could be made
showing the same was opposed by the president and
voted down by the majority; that the minority protested

against the continuation of the president in office and endeavored, without success to separate the office of president and general manager; that the majority promptly re-elected the president and continued his salary at five thousand dollars per year.

It is also charged that the mercantile company, in which the minority held no interest, and which was practically owned by the majority, made a large profit out of its business with the sawmill company; that the employees of the sawmill company were paid in non-negotiable checks, which could be used in trade at the store of the mercantile company; that upon an occasion when the mercantile company was temporarily out of business the president of the sawmill company in cashing these checks taken in by other stores demanded a discount of seven and one-half per cent, and that no such discount was ever demanded or collected from the store of the mercantile company; that a large sum would have been realized for the sawmill company by the collection of this discount from the mercantile company; that bad debts owing by employees of the sawmill company to the mercantile company were charged to the sawmill company; that the clerical force of the sawmill company also kept the books of the mercantile company, and that the mercantile company had a monopoly of the trade of the employees of the sawmill company; that the freight of the mercantile company was transported free over the railroad of the sawmill company, excursions ran over that road for the free transportation of customers of the mercantile company, and that the president and general manager used the ways and means of the sawmill company to further the interests of his mercantile company, and also for his own private interests.

It is also charged that the books of the company wholly failed to disclose the true condition of the business, and failed to provide a record of the timber cut, and to give information from which an estimate can be made of the

value of the company's property.  It is shown that no
dividend has ever been paid the minority stockholders,
and that B. E. Brister, president of the company, esti-
mated the stock to be worth thirty-two dollars per share,
though in one instance he offered as much as forty dol-
lars per share.

It is shown that the sawmill company made a contract
with the Louis Werner Sawmill Company, constituting
the last-named company as sales agents; and providing
a commission of eight and ten per cent. on the entire
product of the mill; that the Louis Werner Sawmill Com-
pany has violated its trust in failing to account for lum-
ber at the prices sold, and has refused to allow an in-
spection of the books, and appellants have ascertained
the failure of the Louis Werner Sawmill Company to ac-
count for ten thousand, two hundred dollars and eighty-
three cents; that this information was from a partial
accounting, and that a full accounting should be re-
quired; that the commission allowed the Werner Saw-
mill Company was excessive.

It is also charged that information from the president
shows the net amount received from the stumpage was
an average of ninety-eight cents per thousand, when the
value of the stumpage in the timber not manufactured
was from two dollars and fifty cents to four dollars per
thousand; that the small sum realized out of the stump-
age was by reason of the poor management of the affairs
of the company.

It is charged in the bill that the management of the
company contracted debts in violation of section 924 of
the Code of 1906 to the amount of fifty-three thousand
dollars in excess of its caiptal stock.

It is also charged that the president and general man-
ager was slipshod and negligent in keeping the accounts
of the company, and the valuations were based on mere
guesses, and not upon properly made appraisements or
original costs; that under the administration of B. E.

Brister and the majority stockholders the object for which the company was chartered has failed and is impossible of successful execution; that the purpose of the stockholders in making the investment was to make profit for themselves, and that there has been a failure as to this, and that the operation of the company has been for the benefit of the president and his associates and the sales agents; that by reason of the gross, negligent incompetency and inattention to business, and in disregard of the rights of the minority, the business has been conducted at a loss, and the president and his associates have been guilty of a violation of the trust imposed upon them as the managing officers of the company; that the continuation of the business as it has been conducted will result in irreparable injury and loss to appellants, and that it is necessary for their protection that the assets of the company should be placed in the hands of a receiver for safe-keeping, and abide the further decree of the court, and that waste of the property may be stopped; that appellants have made every effort towards reforming the management of the company, and that these efforts have been spurned; that they are in a helpless minority, unable to sell their stock, except to B. E. Brister, for such price as he might name; and that they are powerless to protect themselves by proceeding within the corporation, and are compelled to appeal to a court of equity for a redress of their wrongs and the preservation of their property.

The bill prayed an accounting from the B. E. Brister Sawmill Company and the Louis Werner Sawmill Company, the appointment of a receiver to take charge of and preserve the property of the company, and abide the orders of the court, an inventory showing the valuation of the company's property, and the disposition of the property of the company in accordance with the law and equities of the case.

We know that in the past the courts have laid down as a general rule that a court of equity, in the absence

of statutory authority, is without jurisdiction at a suit of a stockholder to wind up the affairs of a solvent going corporation, or to appoint a receiver with that end in view; and we understand that this rule has been based upon the reason that a corporation is the creature of the state and its life depends upon the action of the state, or of the stockholders as a whole. We find that in the progress of time and in the development of the jurisprudence of our land this rule has been somewhat changed, and the power of a court of equity has been enlarged for the purpose of more fully protecting the interests of all those owning interests in corporations. In truth, at the present time a large part of the business of the world is being conducted through corporations. It has been necessary to change materially the general rules originally applied by the courts in construing the obligations and duties of those engaged in business through corporations. The tendency of the times is to treat corporations as if they were trading copartnerships, with the stockholders as members of the concern. It was stated by Chancellor WALWORTH that: "Joint stock corporations are mere partnerships, except in form; the directors are the trustees or managing partners, and the stockholders are the *cestuis que trust,* and have a joint interest in all the property and effects of the corporation." In the case of *Fougeray* v. *Cord,* 50 N. J. Eq. 185, 24 Atl. 499, HINMAN, C. J., said: "Joint stock companies in modern times are nothing but commercial partnerships which have taken the form of corporations for the greater facility of transacting business."

It is certainly the duty of the officers and directors of a company to conduct its affairs so as to carry out the purposes of its organization to succeed in the business enterprise in hand, to preserve its property, and to recognize and protect the rights and claims of all parties in interest. If they fail in doing this, it is then their duty to bring the affairs of the company to a con-

clusion. The majority of the directors and stockholders
should see that this is done. Now, if in the face of the
failure of the management to do its duty, and of the
failure of the purposes of organization, and of apparent
loss to the company and ultimate insolvency, the majority
refuses to wind up the affairs of the company, then
should not the rights of the minority stockholders be
protected by the law? And if so, is not equity the proper
court to extend such protection? We fully understand
that everything possible should be done by the minority
to get a recognition of their rights and preservation of
their interests within the corporation; but, when it has
been shown that this has been done, then it should not
be said they are. without any means of relief, and that
they are required in the administration of the law, to
stand idly by and see the property in which they are in-
terested wasted and lost and the business enterprise
wrecked.

It has been decided that: "If it plainly appears that
the object for which the company was formed is impossi-
ble, it becomes the duty of the company's agents to put
an end to its operations and wind up its affairs; and
should they, though supported by a majority of the stock-
holders, pursue operations which must eventually be
ruinous, or should the enterprise be abandoned as im-
possible of realization, any shareholder would, upon
plain equitable principles, be entitled to the assistance
of a court of equity, and decree should be rendered com-
pelling the directors to wind up the company's business
and distribute its assets among those entitled to them."
*Ulmer* v. *Maine Real Estate Co.*, 93 Me. 324, 45 Atl. 40;
*Benedict* v. *Columbus Construction Co.*, 49 N. J. Eq. 23,
23 Atl. 485.

In the case of *Hall* v. *Nieukirk*, 12 Idaho, 33, 85 Pac.
485, 118 Am. St. Rep. 188, where it is shown that the man-.
ager of a corporation was incompetent, and a conspir-
acy existed between him and other directors to loot the

crporation of its profits, and that under his manage-
ment large debts had accrued against the company, it
was decided that on complaint by stockholders a receiver
should be appointed, and that the court has jurisdiction
to appoint a receiver of the corporation *pendente lite*.
In this case the court made the following quotation from
the opinion in the case of *Gibbs* v. *Morgan,* 9 Idaho, 100,
72 Pac. 733: "As far as possible, courts of equity should
adapt their practice to the existing conditions of the
business world, and apply their jurisdiction to the
changed conditions and cases arising thereunder, and
should not too strictly adhere to forms and rules, es-
pecially under different circumstances, and decline to
administer justice and enforce rights for which there
is no other remedy."

In the case of *Miner* v. *Belle Isle Ice Co.,* 93 Mich. 97,
53 N. W. 218, 17 L. R. A. 412, it is held that the law
requires of a manager of a company the utmost good
faith in the control and management of the corporation
as to the minority. And the court stated that: "It is the
essence of the trust that it shall be so managed as to pro-
duce for each stockholder the best possible returns for
his investment." In the case of *Columbia National
Sand Dredging Co.* v. *Washed Bar Sand Dredging Co.*
(C. C.), 136 Fed. 710, it is decided that where the ma-
jority stockholders of a corporation were also the direct-
ors, and are clearly violating the charter rights of the
minority, as by diverting all the earnings of the com-
pany to themselves, either directly or indirectly, a court
of equity will appoint a receiver at a suit of a minority
stockholder, although the company is solvent. The court
in this case stated that a temporary receivership may
be created where the corporation is entirely solvent, yet
the corporate officers by mismanagement or fraud are
jeopardizing the property; such acts giving the stock-
holders and creditors a right to complain and ask for
a receiver. It was decided in the case of *Ross* v. *Ameri-*

*can Banana Company,* 150 Ala. 268, 43 South. 817, that where a private business corporation has failed of the purposes and objects of its creation a single stockholder may maintain a bill in equity for its dissolution and the distribution of its assets among those entitled thereto, and this without reference to the solvency of the corporation. In *Fougeray* v. *Cord, supra,* it is stated: "The peculiar province of this court (equity) is not only to right wrongs already committed, but to protect property from future injury and waste by withdrawing it from the reach of danger. In the case of a willful breach of trust, it not only compels the guilty trustee to restore the trust property, but removes it from the possession and control of the custodian who has proved unworthy. There is nothing in the character of a trading corporation to prevent the application of this remedy." In the case of *Exchange Bank* v. *Bailey,* 29 Okla. 246, 116 Pac. 812, 39 L .R. A. (N. S.) 1032, HAYES, J., delivering the opinion of the court, said: "The officers of the corporation in the management and control of its assets are the trustees of the stockholders, and are charged with the faithful management of the corporate property for the accomplishment of the purposes for which the corporation is chartered, and where the corporation is insolvent, as the bank is alleged to be in this case, they are also the trustees of the creditors. It would certainly be a confession of extreme weakness in the power of a court of equity, which is presumed to afford a remedy where no adequate remedy at law can be had, to hold that plaintiff in this case, under the facts, can be afforded no relief in equity."

Mr. Thompson, in his work on Corporations (2 Ed.), section 4622, in discussing stockholders' right to a receiver to prevent the wrecking of a corporation, says: "A stockholder has an unquestioned right to the appointment of a receiver where the facts disclose a scheme on the part of the directors or majority stockholders to

wreck the corporation and dissipate its assets. Said one of the courts, after noting the hesitancy of courts to interfere in the management of corporations: 'It may be further said that this court has never denied power in a chancellor to prevent a scheme of irreparable injury and wrong, merely because the movers in that scheme speak and act in a corporate capacity rather than in an individual capacity.' That solvent corporations are wrecked for purely selfish and illegal purposes, that minority interests are 'frozen out,' that business immortality has run amuck under the assumption that courts are powerless, is too true. But the assumption is wrong. Judicial hesitancy does not mean judicial atrophy or paralysis. The board of directors of a corporation are but trustees of an estate for all the stockholders, and may not only be amenable to the law, personally, for a breach of trust, but their corporate power under color of office to effectuate a contemplated wrong may be taken from them when, by fraud, conspiracy, or covinous conduct, or extreme mismanagement, the rights of minority stockholders are put in imminent peril and the underlying, original, corporate *entente cordiale* is unfairly destroyed. It would be a sad commentary on the law if, when the trustee of a corporate estate is making an improper disposition of it, or has shown improper partiality toward one of its conflicting parties, or has put the estate in a fix where it is liable and likely to be either wasted or destroyed, or mercilessly taken from all and given to a part, a court could not reach out its arm and preserve and administer the estate. We have never so declared the law.''

In the note to the case of *Secord* v. *Wheeler Gold Mining Co.*, 17 Ann. Cas. 917, the rule stated under the subject of ''misconduct threatened or causing serious loss'' is as follows: ''Where it appears that the directors or other officers of a corporation are putting in jeopardy the rights of stockholders or creditors by grossly mis-

managing the business, or by misapplying the property or funds of the corporation, a receiver will generally be appointed.''

It is settled in this state, where there is an absence of a statute on the subject, that a court of equity, at the instance of a creditor, has the jurisdiction to appoint a receiver because of fraudulent mismanagement of the directors of a corporation. *Benjamin* v. *Staples,* 93 Miss. 507, 47 South. 425. We see no sufficient reason why it should not also be settled that a court of equity in this state, when it shall appear that by gross mismanagement of the affairs and misapplication of the property or funds of a corporation by the directors, or other officers in control, the rights of the stockholders, as well as the creditors, are being put in jeopardy, or when it shall be necessary to protect the interests of such stockholders or creditors and preserve the assets of the business injuriously affected by such mismanagement or of fraud in the management, may appoint a receiver to take charge of the business of the corporation, and in proper cases, under the orders of the court and in the progress of the receivership, wind up such business. Therefore, in the present case we decide that the chancery court has the jurisdiction to appoint a receiver at the instance of the minority stockholders, to take charge of the business of the corporation, and if it is shown to the court to be necessary, to wind up such business. The bill, with the amendment thereto, is sufficient to require answers of the appellees.

We do not see that interests of the Louis Werner Sawmill Company, the Citizens' Savings Bank & Trust Company, and the Capital National Bank as creditors holding liens will be prejudiced by placing the business of the Brister Sawmill Company in the hands of a receiver. The bill avers that appellants are not seeking to defeat these parties ''in realizing upon any legitimate security they may hold, or in the collection of any legitimate debt

they may claim against the corporation." Appellants
state that their sole purpose in filing the bill is to pre-
serve the property of the corporation, which they al-
lege is being dissipated, to the end that all creditors will
be paid and the stockholders be protected. It will be
noted that appellants pray for an accounting and dis-
covery from the Louis Werner Sawmill Company. In
the general prayer appellants ask that upon a final ad-
judication of the interests of all parties concerned, the
funds in the possession of the receiver may "be dis-
bursed in accordance with the law and the equity of the
cases." The chancery court has full power to make all
necessary decrees to fully protect the rights of the lien
creditors.

The matter of the appointment of a receiver *pendente
lite,* as well as a receiver generally, is committed to the
sound discretion of the court. The necessity for such an
appointment should be clear, and the court in making it
should move with due care, and a full consideration of
the interests of all parties concerned.

The court erred in sustaining the several demurrers.

Reversed and remanded, and sixty days' given appel-
lees from the filing of the mandate in the chancery court
in which to answer.

*Reversed and remanded.*