EARLE et al. v. SEATTLE, L. S. & E. RY. CO. et al.

(Circuit Court, D. Washington, N. D. June 26, 1893.)

1. RAILROAD COMPANIES—ULTRA VIRES—ALIENATION OF FRANCHISE.
A railroad company organized under the laws of Washington has no authority to transfer its franchises, except by sale and conveyance or lease made in accordance with the statutes relating to the transfer of titles to such property; and where, by a so-called "traffic agreement," the trustees, without the consent of the minority stockholders, in effect, transfer to another railroad company the entire control and management of the property, for practically the legal lifetime of the corporation, such contract is illegal and void.

2. SAME—RIGHTS OF MINORITY STOCKHOLDERS.
A controlling interest in the stock of a railway company was purchased by another railway company, which thereby secured the election of a board of trustees, consisting of its own officers and employes, who owned no stock in their own right. This board then executed an illegal traffic agreement, whereby the entire control of the franchises and property of the former company was surrendered to the latter. *Held*, that the minority stockholders in the former company could maintain a bill to annul the contract without first applying to the board of trustees for protection.

3. SAME—PLEADING—EQUITY RULE 94—REMOVED CAUSES.
A bill brought in a state court by minority stockholders to obtain relief from an illegal contract made by the trustees will not be *held* insufficient, after removal to a federal court, because it does not allege that complainants sought in vain for relief through the trustees and officers, as required by equity rule 94, for this rule applies only to suits originally brought in the federal courts.

In Equity. Bill by Thomas Earle and Angus Mackintosh, stockholders of the Seattle, Lake Shore & Eastern Railway Company, against said corporation, its trustees, and the Northern Pacific Railroad Company, to enjoin the further operation of the first-named corporation's railways by the latter under a traffic contract; for the appointment of a receiver, and an accounting as to the dealings of said corporations with each other. Application for appointment of a receiver granted.

Stratton, Lewis & Gilman, for complainants.
Ashton & Chapman and A. F. Burleigh, for defendants.

HANFORD, District Judge. I have studied the showing made by the complainants, and the response of the defendants thereto, contained in the pleadings and affidavits, and the arguments of counsel, upon the application for the appointment of a receiver of the Seattle, Lake Shore & Eastern Company's railway lines and business during the pendency of this suit. The case is substantially as follows: Said company was incorporated in the year 1885, under the laws of Washington Territory, with 50,000 shares of

stock, of $100 each, 41,150 of which have been issued. Seattle is, by the articles of incorporation, made the principal place of business of the company. It has issued interest-bearing bonds to the amount of $5,675,000, secured by a mortgage upon all of its property. With money raised by sale of said bonds, lines of standard gauge railway have been constructed and put in operation, extending from Seattle to the foothills of the Cascade range of mountains, in King county, with a branch extending to Sumas, on the boundary between this state and British Columbia, and extending from Spokane, westward, to Davenport, aggregating about 227 miles; and it appears to have an undefined interest in a belt line around Lake Washington, which has never been operated. Valuable terminal grounds at Seattle have also been acquired, and station buildings have been erected at all places on said lines where needed. In June, 1890, the Northern Pacific Railroad Company purchased 31,621 shares of said stock, paying therefor $45 per share, and, pursuant to an agreement made with the vendors thereof, has guarantied payment of the principal and interest of all of said Seattle, Lake Shore & Eastern Company's bonds. Manifestly, the purpose of the Northern Pacific Railroad Company, in acquiring a controlling majority of said stock, was to absorb the property, business, and franchise of the Seattle, Lake Shore & Eastern Company. The general manager of the Northern Pacific Railroad Company is now the general manager of the Seattle, Lake Shore & Eastern Company, and a change in the by-laws of the latter company has been made, conferring upon its general manager absolute control of the operation of said railway lines. The five trustees of the Seattle, Lake Shore & Eastern Company are all without individual interest in the company,—mere nominal stockholders and representatives of the Northern Pacific Railroad Company, four of them being officers and agents of said company. The president and other officers are nonresidents of the state of Washington. The stock book of the company, which is, by law, required to be kept at the office of the company, is in New York; and the accounts of the company are being kept by employes of the Northern Pacific Railroad Company, in St. Paul. A traffic contract has been entered into between the two corporations, which, in effect, deprives the Seattle, Lake Shore & Eastern Company of all independence, and reduces it to the position of a dependent and feeder of the Northern Pacific Railroad Company, and obligates it to construct new lines of railway and extensions at the dictation of the Northern Pacific Railroad Company. Said traffic contract is, by its terms, to continue 40 years, and thereafter still to continue in force, until abrogated by six months' notice, which practically makes its duration for the legal lifetime of the Seattle, Lake Shore & Eastern Company. The action of this corporation, in the particulars referred to, has been by its board of trustees; and the minority stockholders have not consented thereto, nor have they been called upon to vote at any stockholders' meeting, otherwise than in the annual elections of trustees.

The only authority found in the charter of the Northern Pacific

Railroad Company for what has been done in absorbing the property and franchise of the Seattle, Lake Shore & Eastern Company, and assuming liability for its bonded indebtedness, is section 17, supplemented by a provision of the laws of this state authorizing railroad corporations to purchase or lease and operate connecting lines of railway in this state, enacted March 28, 1890, (Laws Wash. 1889-90, p. 527.) The section of the charter referred to reads as follows:

"Sec. 17. And be it further enacted, that the said company is authorized to accept to its own use any grant, donation, loan, power, franchise, aid, or assistance which may be granted to, or conferred upon, said company by the congress of the United States, by the legislature of any state, or by any corporation, person or persons; and said corporation is authorized to hold and enjoy such grant, donation, loan, power, franchise, aid, or assistance to its own use for the purpose aforesaid."

The statute referred to does not prescribe the manner whereby purchases or leases of railways may be consummated, otherwise than by the general provisions of the several statutes relating to corporations; and to conveyances of property. A railroad corporation cannot lawfully transfer its franchise without authority emanating from the power which granted it. And an unauthorized transfer, made in disguise, as by a traffic contract, will not, in a judicial proceeding, be treated with greater favor than if the contract expressed plainly the real intention of the parties. On the subject of traffic contracts, the text of Green's Brice's Ultra Vires (page 427) concisely and clearly states the law, as follows:

"Corporations may make all necessary arrangements for cheaply and expeditiously developing or carrying on their particular business; but it is another thing, going beyond this, to enter into contracts, for instance, by which the exclusive control, or the exclusive right of working the line is handed over to other parties. All such arrangements, whatever their form, however disguised, are ultra vires and void. This applies with peculiar force in the case of those bodies which have been created for what may be conveniently styled 'public purposes.'"

Now, assuming that the section of the charter above quoted does authorize the Northern Pacific Railroad Company to take the benefit of rights and privileges, and exercise new powers, granted and conferred by the state of Washington, the question whether the contracts and proceedings by which it has gained control of the Seattle, Lake Shore & Eastern Company's franchise and business are ultra vires or not depends upon whether the requirements of the state laws in this regard have been met. There has been no sale and conveyance, nor lease, of the railroad property, in accordance with the laws of this state relating to the manner of transferring titles to such property. As the parties have not done what the statute authorizes to be done, I do not think that the deal between them has any governmental sanction whatever. No consolidation has been attempted, and yet the transaction is of such resemblance to a consolidation that the legal principles by which the validity of proceedings to effect a consolidation of corporations may be applied. This idea leads to consideration of the contract rights of individual stockholders; and the rule is that a corporation cannot be consoli-

dated with another if the right to do so was not by the law, or the constating instruments, given at the time of its creation, without the unanimous consent of its stockholders. The law on this subject is thus stated in 2 Mor. Priv. Corp. § 951:

"A corporation cannot consolidate with another company, even pursuant to legislative authority, except with the consent of all its shareholders. An unauthorized consolidation may be prevented by any dissenting shareholder, or may be treated as ground for severing his connection with the company, by a rescission of his subscription."

For want of consent on the part of all the shareholders of the Seattle, Lake Shore & Eastern Company, I am unable to affirm the validity of the practical merger of said company with the Northern Pacific Railroad Company.

The answer contains the following exposition of the business and condition of the Seattle, Lake Shore & Eastern Company:

"That the Seattle, Lake Shore & Eastern Railway Company commenced to do business in April, 1888—

| | |
|---|---:|
| And from that time to June 30, 1889, a period of fifteen months, earned, from all sources | $243,936 58 |
| And during the same period its operating expenses and fixed charges amounted to | 269,429 97 |
| Leaving a deficit of | $ 25,493 39 |

"That for the year ending June 30, 1890, the result from operation was as follows:

| | |
|---|---:|
| Gross earnings from all sources | $372,894 55 |
| Operating expenses and fixed charges | 437,764 26 |
| Deficit for the year | $ 64,869 71 |
| Total deficit to June 30, 1890 | $ 90,363 10 |

"For the year ending June 30, 1891, the result from operation was as follows:

| | |
|---|---:|
| Gross earnings from all sources | $430,710 72 |
| Operating expenses and fixed charges | 597,942 51 |
| Deficit for the year | $167,231 79 |
| Total deficit to June 30, 1891 | $257,594 89 |

"For the year ending June 30, 1892, the company earned as follows:

| | |
|---|---:|
| Gross earnings from all sources | $429,190 65 |
| Operating expenses and fixed charges, including omissions of the previous years | 896,892 40 |
| Deficit for the year | $467,701 75 |
| Total deficit to June 30, 1892 | $725,296 64 |

"For the eight months ending February 28, 1893, the earnings of the railroad are as follows:

| | |
|---|---:|
| Gross earnings from all sources | $324,359 97 |
| Operating expenses and fixed charges | 499,331 42 |
| Deficit for the eight months | $174,971 45 |
| Total deficit to February 28, 1893 | $900,268 04 |

"That the interest on the bonded indebtedness of said company has been met as follows:

"For interest due August 1, 1888, was $28,335.71, and was provided for as follows:

| | | |
|---|---:|---:|
| Borrowed from D. H. Gilman | $ 14,000 | 00 |
| From Jameson, Smith & Cotting | 14,335 | 71 |
| Total | $ 28,335 | 71 |

"Interest due August 1, 1889, was provided as follows:

| | | |
|---|---:|---:|
| Borrowed from A. M. Cannon | $ 40,000 | 00 |
| Advanced by Seattle & Eastern Con. Co. | 9,727 | 05 |
| Provided by the company | 9,200 | 00 |
| Total | $ 58,927 | 05 |

"Interest due February 1, 1890, $69,416.67, was provided as follows:

| | | |
|---|---:|---:|
| Advanced by Seattle & Eastern Construction Company | $ 57,936 | 67 |
| Provided by the company | 11,480 | 00 |
| Total | $ 69,416 | 67 |

"Interest due August 1, 1890, $123,000, was provided as follows:

| | | |
|---|---:|---:|
| Advanced by the Northern Pacific Railroad Company | $ 73,000 | 00 |
| Advanced by Seattle & Eastern Construction Company | 10,000 | 00 |
| Provided by the company | 40,000 | 00 |
| Total | $123,000 | 00 |

"So that the Seattle, Lake Shore & Eastern Railway Company has paid, in interest, on its bonded indebtedness, the sum of $60,000. All the balance of the interest since that time has been paid by the defendant the Northern Pacific Railroad Company.

"That the Northern Pacific Railroad Company, since July, 1890, has paid out, for and on account of the Seattle, Lake Shore & Eastern Railway Company, on account of such guaranty and otherwise—

| | | |
|---|---:|---:|
| For interest on the funded debt of the Seattle, Lake Shore & Eastern Railway Company | $900,490 | 00 |
| For taxes | 23,665 | 68 |
| For account of the sinking fund | 84,500 | 00 |
| To pay outstanding indebtedness evidenced by notes | 47,614 | 56 |
| To pay indebtedness of Seattle, Lake Shore & Eastern Railway Company to Seattle & Eastern Construction Company, and for equipment, less all credits | 265,674 | 46 |
| For losses in operating Spokane Division from September 23, 1890, to March 31, 1892 | 24,975 | 43 |
| And after allowing all credits due from the Northern Pacific Railroad Company to the Seattle, Lake Shore & Eastern Railway Company, the Seattle, Lake Shore & Eastern Railway Company stands indebted to the Northern Pacific Railroad Company in the sum of | 1,335,460 | 64 |

"That the Northern Pacific Railroad Company has paid to the Seattle & Eastern Construction Company, for equipment which it supposed the Seattle, Lake Shore & Eastern Railway Company was the owner of at the time it purchased the aforesaid stock, the sum of $209,006.07."

A detail statement from the company's books shows expenditures for operating expenses, separate from other fixed charges, to have been as follows:

| | | |
|---|---:|---:|
| For three months ending June 30, 1888 | $ 17,014 | 17 |
| For year ending June 30, 1889 | 121,347 | 55 |
| For year ending June 30, 1890 | 237,860 | 69 |
| For year ending June 30, 1891 | 326,832 | 85 |
| For year ending June 30, 1892 | 364,108 | 43 |
| For eight months ending February 28, 1893 | 216,021 | 83 |

The amounts given for each of the years 1890, 1891, 1892, are inclusive of expenditures chargeable to previous years.

From this it appears that the company is not earning sufficient to pay actual operating expenses, as it is now being managed, and other fixed charges. It is insolvent, and the Northern Pacific Railroad Company is strengthening its grasp by holding a claim for cash advances, which is being constantly augmented; and yet an uncontradicted affidavit quotes from a recent address from the management of the Northern Pacific Railroad Company, answering a criticism with reference to this deal, a statement to the effect that for the period of six months ending December 31, 1892, that company, from business originating cn the Seattle, Lake Shore & Eastern Company's lines, made a net profit, after paying interest on said bonds, of about 12½ per cent. of the outlay to secure control of said lines. The showing, however, is lacking in minuteness of detail sufficient to enable the court, or those interested, to judge of the accuracy of the statement, or justice of the claim which the Northern Pacific Railroad Company now makes for cash advances; and the books and vouchers showing the items and particulars of the account between the two companies are, as before stated, all in the hands of the Northern Pacific Railroad Company, at St. Paul.

To summarize, I find that, without legal authority, the Northern Pacific Railroad Company has assumed full control of the Seattle Company, and is now operating its railway lines without consent of its stockholders. The latter company is insolvent, and its books are being kept out of the state in which it has its legal home. None of its present board of trustees or officers own any of its stock, individually, and they have no interest in the concern, except as representatives of the Northern Pacific Railroad Company. The position of the Seattle, Lake Shore & Eastern Company is such that it cannot extricate itself, by suit or otherwise, from the meshes woven about it by its chief stockholder, nor do justice to the minority stockholders. These proceedings are illegal, and violations of the contract rights of the complainants as stockholders, and entitle them to proper relief. In my judgment, they are entitled to an accounting, as prayed for in their bill, and a fair adjustment of the rights of all parties will be facilitated by the appointment of a receiver. Operation of the railways in connection with the Northern Pacific Railroad Company cannot be abruptly terminated, but may be continued, under direction of the receiver, upon equitable terms. The trustees and managing officers of the Seattle, Lake Shore & Eastern Company cannot, while serving as subordinate officers and employes of the Northern Pacific Railroad Company, call that company to an account, nor proceed contrary to the wish of that company, without jeopardizing their personal interests. The case is therefore exceptional, and I think that the complainants have a right to maintain the suit, although they have not applied for protection to the board of trustees. See 1 Mor. Priv. Corp. §§ 242, 245, 268, 273, 275.

The bill of complaint is not, because of failure to set forth therein the efforts of complainants to secure action by the board of trustees, in accordance with equity rule 94, insufficient. This suit was commenced in one of the courts of this state, and was removed hither by the defendants. Rule 94 has reference to suits commenced originally in the national courts, and was not intended to bar the removal of a suit in equity from a state court.

Application for receiver granted.