AMES v. GOLDFIELD MERGER MINES CO. et al.

(District Court, W. D. Washington, N. D.   May 6, 1915.)

No. 52.

1. CORPORATIONS ☞298, 305—DUTIES AND POWERS OF DIRECTORS—DELEGATION OF AUTHORITY.

The stockholders of a corporation have a right to expect from their directors a conscientious consideration of every proposition which is presented, and which involves any interest of the company, and such consideration must be given and action taken in formal meetings. The directors have no power to act as such individually, nor can they delegate the powers vested in them to act for the corporation to any officers or men, even though they are the majority stockholders.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1292–1317, 1319, 1329–1332; Dec. Dig. ☞298, 305.]

2. CORPORATIONS ☞180—MINORITY STOCKHOLDERS—RIGHT TO EQUITABLE REMEDY.

Where the business and affairs of a corporation, instead of being managed by its directors, are taken over by the agents and officers of other concerns having the same majority stockholders, and are managed in the interests of such other corporations, and the minority stockholders are deprived of their just rights, they are entitled to a remedy in equity.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 665–673; Dec. Dig. ☞180.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. MINES AND MINERALS ⊜⟩104—MINING CORPORATIONS—GROUNDS FOR AP-
POINTMENT OF RECEIVER—MALADMINISTRATION.

The directors of a mining company met but four times in four years, and did not call a stockholders' meeting for more than three years, during which time the company expended $250,000, which was practically all of its available funds, and also sold property for $50,000 which a short time afterward was worth $500,000. All of such business was transacted without authority from the directors, by officers who were also officers or employés of other mining companies having the same majority stockholders. The work done was not calculated to, and did not, benefit the company, but did benefit the other companies. *Held*, that such facts entitled minority stockholders to the appointment of a receiver.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 228; Dec. Dig. ⊜⟩104.]

In Equity. Suit by Lucy V. Ames against the Goldfield Merger Mines Company, the Goldfield Deep Mines Company, J. Ross Clark, and C. A. Whittemore. On motion for continuance of receivership. Motion granted.

Bausman, Oldham & Goodale, of Seattle, Wash., for complainant.

Hoyt, Gibbons & French, of Reno, Nev., and Peters & Powell, of Seattle, Wash., for defendants.

NETERER, District Judge. A temporary receiver was appointed in this case, on bill of complaint and affidavits of the complainant, for the Goldfield Merger Mines Company, and the cause set for hearing upon application for a continuance of the receivership by the court, and a show-cause order was issued to defendants. Amended bill of complaint was filed, and the matter came on for hearing before the court upon the amended bill, the answer of the defendants, and affidavits made in behalf of the several parties, on the 14th day of April, 1915. From the admitted facts and the affidavits it appears that the Goldfield Merger Mines Company, which will be called "Merger Company," and the Goldfield Deep Mines Company, which will be called "Deep Mines Company," are corporations, each of them organized and existing under the laws of the state of Washington, with the principal place of business of each in the city of Seattle. The Merger Company was organized in the year 1908, and the Deep Mines Company in 1911, and complainant is now and has been a shareholder of record on the books of the Merger Company since 1911. The principal object of the Merger Company is the business of mining, and it is now possessed of divers gold claims, said to be valuable, at Goldfield, in Esmeralda county, Nev. The authorized capital stock of the company is $5,000,000, divided into that number of shares. In July, 1911, all of the shares, except 1,148,677, had been issued to various parties throughout the United States. This number remained in the treasury of the company. The company had been engaged in the exploration of its several claims prior to this date, and was solvent, and was desirous of securing further sums for further exploration. Ores had been found in the various claims of the company, of value, and of such a character as to make further explorations and development desirable. Adjoining the claims of the Merger Company were mines of the Goldfield Consolidated Mining Company, a corpora-

tion organized in 1911, and which had for some time been engaged in mining on a large scale, with profit. The properties of the Goldfield Consolidated Mining Company, and other companies that were controlled by the parties who controlled and managed this company, border on three sides of the property of the Merger Company. The other companies were known as the Atlanta Mines Company, the Kewanas Mining Company, and the Booth Mining Company. George Wingfield was in control of the Goldfield Consolidated Mining Company, and also the other companies named. A railroad, known as the "Salt Lake Route," running from Salt Lake to Los Angeles, has a branch line running to this mining district, known as the Las Vegas & Tonopah Railroad. This is owned, or managed, at least, by W. A. Clark, well known to the mining world.

The board of directors of the Merger Company and the majority stockholders were desirous of developing the Merger Company as an independent concern, and not to become absorbed by the Goldfield Consolidated Company, and Mr. Wingfield and those in charge and control of the Consolidated and allied corporations were desirous of obtaining control of the Merger Company. In July, 1911, O. C. Whittemore, at the suggestion of Wingfield and others operating with him, in behalf of the Consolidated Company, came to Seattle, and either by direct statements or by suggestions or conduct, led the majority stockholders to believe that he was representing W. A. Clark, of Montana, the mining man, and through such understanding purchased a control in the Merger Company, and led the majority stockholders of the Merger Company to believe that it was the desire of W. A. Clark that he be not known in the transaction, but that the stock be carried in the name of J. Ross Clark, his brother. The control of the Merger was thereupon sold to Whittemore for $300,000. $250,000 of this money was to be put into the treasury of the company for development purposes, and $50,000 paid to some of the shareholders for stock owned by them to make up the control. It was agreed that a new company should be formed, called the Goldfield Deep Mines Company, with a capital of $10,000,000, divided into 10,000,000 shares. The majority shareholders made the exchange by turning their shares to Whittemore and his associates and taking the Deep Mines shares, and this was done to a sufficient extent to pass the control of the Merger Company to the Deep Mines Company. Whittemore and J. Ross Clark obtained in this way a majority and voting control of the Merger Company and also of the Deep Mines Company, and have ever since so held it. The board of directors selected for each company was J. Ross Clark, O. C. Whittemore, C. E. Redman, John Erikson, and Claude M. Smith. Whittemore was elected president of the Merger Company and vice president of the Deep Mines Company, and J. Ross Clark was elected president of the Deep Mines Company, which offices these men have since held. C. E. Redman is a local employé of the Las Vegas & Tonopah Railroad and subordinate official therein. Whittemore is attorney for this railroad company, and J. Ross Clark also has some official connection with this road. Erikson and Smith were directors of the Merger Company before the Deep Mines organization, and are representatives of the minority in each com-

pany. The Deep Mines Company is simply a holding corporation, and has no other purpose, and seems to perform no other function, than holding the stock interests of the Merger Company. Complainant did not exchange shares with the Deep Mines issue and holds none of that stock.

Wingfield is president of the Atlanta Mines Company and for some years was president of the Consolidated Company, and also president of the Kewanas Mining Company, and is in control of the Booth Mining Company, and a man of great influence in the mining district of Goldfield. After the organization of the board in these companies, and in September, 1911, L. H. Metzgar was appointed general manager of the Merger Company, and served until April, 1913. Prior to his appointment to this position, he was with the Consolidated Company, and upon retiring from the Merger Company he immediately resumed the position of one of the superintendents of the Consolidated Company, and is now superintendent of a company controlled by the Consolidated Company. In April, 1913, John Mocene was appointed manager of the Merger Company, and also retained the position of overhead or top superintendent of the Consolidated Company, and in this double employment remained until August, 1913, when he was succeeded by K. M. Simpson, who was in the employ of Wingfield as field engineer, he acting in this dual capacity while with this company, and when he left the Merger Company he became assistant manager of the Consolidated Mining Company. Simpson was succeeded in the spring of 1914 by A. I. D'Arcy, who is the present manager of the Merger Company, and was a field or exploring engineer for Wingfield, and is now consulting engineer for Wingfield. Claude M. Smith was the Merger Company's secretary before the Deep Mines and Consolidated control, and remained until June, 1912. He was never connected with the Consolidated Company or Wingfield Company, and was disinterested, and is now a trustee. He was requested to resign as secretary. H. H. Hudson was selected as secretary of the company, a former employé in the bank of John S. Cooke & Co. of Goldfield, which is controlled by Wingfield, and during a portion of the time served the bank as well as the company. In September, 1914, Hudson was succeeded by J. C. Walther, who is simultaneously acting as assistant manager of the bank named. F. C. Favier, the assistant secretary of the Consolidated Company and of all the Wingfield properties in Southern Nevada, is in the joint relation of acting for the Merger Company and the Wingfield properties now. All the books of the Merger Company, after the Wingfield and Clark control, have been kept at Goldfield, Nev., in the office and safe of the Consolidated Mining Company. The Merger Company's attorneys in Nevada are attorneys for Wingfield, for the Consolidated Company, for the Atlanta Mines Company, and for the Booth Mining Company.

In the employment of experts in or about the property of the Merger Company, those in the employ of the Consolidated Company and the Wingfield interests were employed. No report was obtained from any other source. After the receipt of the $250,000 by the Merger Company, the manager of the company began sinking a three-compartment shaft on the St. Ives claim of the Merger Company. A

shaft at this point had been sunk 350 feet several years prior, but had been abandoned as not desirable. When work was resumed the shaft was enlarged to a three-compartment shaft. The slope of the veins in this district is downward from west to east, and as the "extralateral pursuit" gives a privilege to the Consolidated Company and Atlanta Company, and the right to pursue beyond their side lines any veins having their apex within the boundaries of either, development of the Merger Company's claim might result in favor of the Consolidated Company and Atlanta Company. At the time of the sinking of this shaft there was nothing that would indicate that a development or discovery might be made. The location of these several claims and mining interests, the mining companies' properties, and the Goldfield Merger Mines Company, is set forth in the following map:

No ore had been found in or through this shaft, nor did the new work develop any paying vein. At a depth of 1,300 feet a cross-cut was run from this shaft to the Grizzly Bear in connection with the workings of the Consolidated Company, and then the shaft was further sunk to a depth of 1,752 feet, and a tunnel was run from this shaft to the Atlanta Mines Company boundary. The following map shows a cross-section of this shaft and tunnel to the Atlanta Mines:

SKETCH

NORTH–SOUTH SECTION THROUGH

ST. IVES SHAFT

SECTION 'B-B'

And the following map shows the various tunnels running from the shaft of the St. Ives to the Grizzley Bear claim and to the Atlanta Mines, and also the tunnels that were extended from the shaft of the Jumbo Extension claim, to which reference will be made:

At no stage of this work did the Merger Company obtain a waiver of apex rights, either from the Atlanta Mines Company or the Consolidated Company. No action was taken at any time by the directors for the Merger Company, and no record is made of any arrangement with the Atlanta Mines Company, or any company, with respect to the use of this shaft or the tunnel, or for sharing of expense, but the Atlanta Company did pay $35,000. There was expended by the Merger Company for installing pumps and machinery at the shaft on the St. Ives claim nearly $13,000, at a time when the sole beneficiary seemed to be the Atlanta Company. The Merger Company's manager, who had charge of this work, is also the manager of the

Atlanta Company, and no memoranda of any sort existed between the two companies with relation to the use of this shaft, or the expenditures of the moneys, or any rentals or royalties to be paid on the part of the Atlanta Company, or any contributions to be made, or anything with relation to ownership, use, interest, or expenses. Subsequently to the appointment of the temporary receiver, the Atlanta Company agreed to pay something like $33,000 towards this expenditure. The Velvet claim was sold by the Merger Company, upon the advice and suggestion of Mr. Wingfield, to the Jumbo Extension Company, after the Jumbo Extension claim had been practically worked out, and was sold for the consideration of $80,000, of which $10,000 was cash, and the balance in installments, and 171,000 shares of stock in the Jumbo Extension Company. This stock was placed in the name of M. E. Hill, trustee, instead of in the treasury of the Merger Company. Hill was cashier of the John S. Cooke & Co. Bank, owned by Wingfield. Shortly after the sale of the Velvet claim, rich ores were struck, and the stock of the Jumbo Extension Company went from considerably less than $1 a share to $3 or $4 a share. Out of the 171,000 shares of Jumbo Extension stock, 21,000 were paid for commissions to Van Dyke, who paid 10,000 of this to Mr. Whittemore, the president of the Merger Company. The 150,000 was afterwards sold by Mr. Howe without any authorization or direction from the board of trustees. This is what Mr. Howe says:

"I am, and have been for more than six years last past, the secretary and president of the Goldfield Consolidated Mines Company, and many other corporations in which Mr. George Wingfield is largely interested. * * * At least 10 corporations in which Mr. Wingfield is largely interested are active companies, prosecuting work and carrying on business, and I have found it to be of very great advantage to these companies to have many matters * * * performed by persons jointly employed by two or three, and in some cases all, of said companies. * * * The friendly co-operation which has characterized the operation of these companies has been beneficial to all parties concerned, and has been a distinct aid to the development of their properties. * * * In my capacity of secretary and president of practically all of the companies in which Mr. Wingfield is interested, and also in my capacity as agent for such companies, and for Mr. Wingfield personally, it has been peculiarly my duty at all times to attend to matters in which he is directly or indirectly interested. The Goldfield Consolidated Mines Company, through the instrumentality of the Deep Mines Company, was and is more largely interested than any one else in the welfare of the Merger Company. That company's officers, and particularly the board of trustees, live at distant points, with one or two exceptions, so that it is seldom possible to hold board meetings with any regularity. For this reason the custom has long obtained, with reference to the conduct of the Merger Company's business, for its general manager and assistant, including myself, to look after the company's interests, and at all times some things need to be done quickly, awaiting subsequent ratification of the board of trustees. When the Merger Company received the 150,000 shares of Jumbo Extension stock as part payment for the sale of the Velvet claim, this stock was for convenience placed in the name of M. E. Hill, trustee, with the idea that it should be sold when market conditions seemed to justify. On or about September 27, 1914, under the advice of the Merger Company's general manager, and with the further advice of Albert Burch, general manager of the Goldfield Mines Company, and with the knowledge of Trustee Hill, and believing that the market conditions were favorable, * * * I caused a part of the shares to be sold. * * *"

At the time this stock was sold the Merger Company was in need of no funds, except for expenditures in the St. Ives shaft, and no need for money would have been occasioned, had the Atlanta Company, in whose interest the shaft appears to have been run, paid to the Merger Company what it is now claimed it has agreed to pay since this receivership. I have referred to this sale, not for the purpose of showing that the parties connected with the sale did not act in good faith, nor exercise their best judgment, but to show that it was not the result of the judgment of the trustees, and that the business of the Merger Company, instead of being conducted by the board of trustees, who had been regularly elected and who are responsible to the stockholders, was done by persons other than the trustees, and who are in the employ of other concerns, whose interests may not be, and is charged are not, in harmony with the best interests of the Merger Company, and concerns in whose interest the money received was expended. Trustee Redman says:

Meetings of the trustees were seldom had, which "led to the transaction of business in an informal manner; the practice often being to permit persons of good character, whose honesty was thoroughly well known, to act on behalf of the company without express prior authorization, and thereafter look to the confirmation of their acts by subsequent ratification or acquiescence and tacit ratification. * * * "

The Merger Mines Company expended in the shaft and tunnels of the St. Ives claim approximately $199,000. It expended other sums in and about and upon the properties of the Merger Company. These expenditures were directed, not by the board of trustees, but under the direction of the officers of other companies, whose interests, it is alleged, were out of harmony with the best interests of the Merger Company, and which companies, as disclosed by the record, did profit by such expenditure, while the Merger Company did not.

At a meeting of the board of trustees, on the 15th of March, 1915, Trustee Erikson offered the following resolution, and moved its adoption, among others:

"Resolved, that this company, in its own name or in that of the receiver, demand an accounting between this company and the Atlanta Mines Company, and an immediate payment of all sums by the latter company, due to this company, and including rent for the use of 1,300 feet of this company's three-compartment St. Ives shaft, for all times heretofore used by the Atlanta Mines Company down to the present time"

—which was defeated; Trustees Clark, Redman, and Whittemore voting against the resolution, and Trustees Erikson and Smith for it. Thereupon the following resolution was offered:

"Resolved, that this company, so soon as it is freed from the receivership, forbid the use of the three-compartment shaft of the St. Ives claim by the Atlanta Mines Company, or other companies, unless such company, or companies, in addition to paying the operating expenses, pay a reasonable rental for the future use of the shaft, inclusive of depreciation charges upon pumping or other machinery belonging to this company."

Upon vote, the resolution was defeated; Trustees Clark, Redman, and Whittemore voting against it, and Trustees Erikson and Smith for it.

The reorganized Booth Gold Mining Company has commenced an "apex suit" against the Jumbo Gold Mining Company and the Merger Mines Company on account of ores discovered and taken out of Velvet. The attorneys for the Booth Mining Company are likewise attorneys for the Merger Company. The board of trustees of the Merger Company have been requested to engage counsel in that action, and have declined to do so. It was stated in open court by nonresident counsel for defendants, who are also counsel for the Booth Company, that they would not enter a default in that case against the Merger Company until the minority stockholders shall have a right to appear and contest any rights therein at their own expense. Service was made upon the resident agent of the defendant Merger Company in Nevada in that suit. Some question as to the regularity of the appointment of this agent had been suggested, and the board of trustees, after the service upon this agent, at a meeting, ratified the appointment of this agent, and confirmed, on behalf of the company, service of process upon the agent prior to that time. Upon the hearing it was admitted in open court that one of the trustees of the Merger Company had in fact dictated the resolution legalizing this service.

At the bar it was stated that the Merger Company had no interest in the "apex suit" of the Booth Mining Company, and that counsel for the company had so advised; but why counsel should advise the Merger Company that it had no interest in the suit, and at the same time advise the Booth Company that it has, and that it was a necessary party to the litigation, and make it a party, is not clear, and a board of trustees looking out for the best interests of the Merger Company would not, under such circumstances, rest secure and not consult other counsel. It is said that:

"This whole case resolves itself, in its ultimate analysis, to this question: Have or have not the directors acted fraudulently? Have or have not Wingfield and the Consolidated Mines Company acted fraudulently? Have they acted dishonestly? Have they sacrificed the Merger?"

[1] The issue is: Have the directors of this company abandoned the company? Have they turned the management of its business over to others, and is the business of the Merger Company now being administered by the officers or employés of other companies, whose business is or may develop antagonistic to the best interests of the Merger Company? The stockholders of a corporation have a right to expect from their directors a conscientious consideration of every proposition which is presented which involves any interest of the company, in conformity to the oath which they have subscribed. They have a right to have the individual viewpoint of the several directors expressed at a conference, for the purpose of obtaining the exchange view of the several persons in arriving at conclusions after deliberate consideration of any issue. It is fundamental that officers of boards can only act as such constituted boards when assembled as such, and by deliberate and concerted action disposé of the issue under consideration, and that they cannot act in an individual capacity outside of a formal meeting, and a majority of the individual expressions be the action of the board. The law believes that the greatest wisdom results from con-

ference and exchange of individual views, and it is for that reason that the law requires the united wisdom of a majority of the several members of the board in determining the business of a corporation, and will not permit the business and concerns of a corporation to be delegated to any officers or men, however capable, or however high their standard for integrity and honesty may be, and that fraud will be implied upon the delegation of such power and right, and the exercise thereof by men who may be the controlling stockholders, even though, in their own conscience, they may believe that everything has been done to the very best interests of the concern; and this is emphasized when the records show that large sums of money have been expended with no beneficial results to the concern, but which do show great benefits to other concerns in which these majority stockholders likewise own large interests, as in this case. It is the abuse of corporate license or power which reflects upon corporate control and casts suspicion upon large corporate holdings. It is the failure to give that consideration to the interests of the minority which the majority would have them give were the positions reversed. The law, therefore, wisely places control of corporations in a board of trustees, and requires its action as a board.

[2] Counsel for defendants say that complainant has another remedy, and that a court will not take the control of the corporation from the board of trustees while other remedies are available; that the parties against whom complaint is made are solvent, and that the minority stockholders can bring an action on behalf of the corporation, however at their own expense; that the majority stockholder has a right to dictate the policy and business affairs of the corporation, irrespective of the desire of the minority, so long as no fraudulent, dishonest, or oppressive conduct is shown; and that the conduct shown in this case is sanctioned and approved. It is said that many men are directors in many different corporations which have contractual relations, and that a court will only see whether the dealings, contracts, etc., are fair, whether the boards have acted impartially; and by that criterion shall the court conclude this issue.

[3] From the record it appears that the directors of the defendant company held four meetings in nearly as many years. The officers made no report to the stockholders. No meeting of the stockholders was called for more than three years. More than $250,000 was expended, practically all of the available funds, during this period of time. This expenditure was directed by officers of other companies controlled by the majority stockholders of the Merger Company, and not by the trustees of the defendant company. $199,000 was spent on a shaft and tunnels which developed nothing for the Merger Company, but did for other companies. No contract was entered into by the board of directors with the other companies for any contribution or sharing of expenses. Stock owned by the defendant company was sold for less than $50,000 by officers of other companies, and not by the board of directors, which within a short time was worth $500,000. The officers who sold the stock were officers of the company for whose benefit the shaft was operated, to pay the expenses of which the stock is claimed to have been sold. The entire record in this case is redolent

with facts showing that the business of the Merger Company was not and is not conducted by the trustees. The fact that the trustees were nominal stockholders is not material. A man need not be a large shareholder to be a trustee, but he must exercise his integrity and his judgment in behalf of the corporation which he represents; nor can he be held responsible for error in judgment, but he cannot be permitted to turn his trust over to others to exercise for him, even though the administration by others of the trust may, in the judgment of such other persons, be honestly carried out.

Under the circumstances disclosed in this case, I do not think that there is an adequate remedy at law. Where the business and affairs of a mining corporation are taken over by the agents and officers of other concerns whose controlling shareholders also control such mining corporation, and the business of such mining corporation is managed in the interest of such other concerns, and the minority stockholders deprived of their just rights, I think there is a liability in equity, and that there is no more valuable function that a court of equity can, under such circumstances, perform, than to protect such minority, and that a court of equity is the only tribune to afford an effective remedy.

From all of the testimony that was presented, the admitted facts, and the indisputable proof upon the issue, it is conclusively established, to my mind, that the Merger Company's identity is practically lost; that its affairs are not and have not been administered by its board of directors, and that the corporate life, except as mere form, has been abandoned, and the administration of its affairs turned over to the executive and administrative officers of the Goldfield Consolidated Mines Company and allied concerns; that the policy of all of the business of the Merger Company has been planned and carried out by the officers and persons who dictated and directed the policy and business of the Goldfield Consolidated Company and allied concerns, and not by the trustees of the Merger Company, and the interest of the Merger Company has not been subserved in the manner it should have been, but that the Merger Company's affairs have been and are being administered in the interest and in behalf of the Goldfield Consolidated Mines Company and allied companies. And it seems to me that the board of trustees of the Merger Company, in this case, is the Goldfield Consolidated Mining Company and allied concerns, and these interests are seeking shelter behind the board of trustees of the Merger Company, and invoking the official relation of a majority of the trustees of this company for their protection in exploiting their own properties at the expense of the Merger Company. Said Lord Mansfield in Johnson v. Smith, 2 Burr. 962:

"The court would not endure that a mere form or fiction of law, introduced for the sake of justice, should work a wrong contrary to the real truth and substance of the thing" (quoted by Circuit Judge Gilbert in Linn & Lane v. U. S., and U. S. v. Smith, 196 Fed. 593, at page 598, 116 C. C. A. 267, at page 273).

In Earle et al. v. Seattle, Lake Shore & Eastern Ry. Co. et al. (C. C.) 56 Fed. 909, at page 910, the court said:

"Manifestly, the purpose of the Northern Pacific Railroad Company, in acquiring a controlling majority of said stock, was to absorb the property, business, and franchise of the Seattle, Lake Shore & Eastern Company. The general manager of the Northern Pacific Railroad Company is now the general manager of the Seattle, Lake Shore & Eastern Company, and a change in the by-laws of the latter company has been made, conferring upon its general manager absolute control of the operation of said railway lines. The five trustees of the Seattle, Lake Shore & Eastern Company are all without individual interest in the company—mere nominal stockholders and representatives of the Northern Pacific Railroad Company, four of them being officers and agents of said company. * * * A traffic contract has been entered into between the two corporations, which, in effect, deprives the Seattle, Lake Shore & Eastern Company of all independence, and reduces it to the position of a dependent and feeder of the Northern Pacific Railroad Company."

The facts in the instant case present many parallels to this case. The application for a receiver is granted.

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes