## TOWER HILL–CONNELLSVILLE COKE CO. OF WEST VIRGINIA v. PIEDMONT COAL CO. et al.

### No. 3436.

Circuit Court of Appeals, Fourth Circuit.
April 21, 1933.

818

John W. Davis, of New York City (E. W. Knight, and Lon H. Kelly, both of Charleston, W. Va., and George E. Alter, A. J. Barron, Thomas Watson, and Robert M. Steffler, all of Pittsburgh, Pa., on the brief), for appellant.

E. C. Higbee, of Uniontown, Pa., and Edwin W. Smith, of Pittsburgh, Pa. (Arthur S. Dayton, of Charleston, W. Va., and Wm. M. Robinson, of Pittsburgh, Pa., on the brief), for appellees.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

NORTHCOTT, Circuit Judge.

This is an appeal from a decree entered in the District Court of the United States for the Southern District of West Virginia, ordering that the business and affairs of the appellant corporation be terminated and wound up; and appointing receivers to sell and convert its properties and assets into money to be distributed among its creditors and stockholders according to their respective rights and priorities.

This case was formerly before this court, and a decision was rendered on July 8, 1929. 33 F.(2d) 703. A petition for rehearing having been filed by appellant, this court on October 15, 1929, handed down a per curiam opinion denying the rehearing. 35 F.(2d) 179. Appellant presented a petition to the Supreme Court of the United States for a writ of certiorari, which was denied on January 13, 1930. 280 U. S. 607, 50 S. Ct. 157, 74 L. Ed. 650.

A statement of the facts of the case up until the time of the former decree appealed from will be found in the opinion of this court, and it will only be necessary to state the facts as to the happenings from that time until the entry, in the court below, of the decree here appealed from.

The case was remanded to the District Court, which entered an order under date of February 25, 1930, authorizing the receivers heretofore appointed to make application to the courts of Pennsylvania or elsewhere for their appointment as ancillary receivers to bring such actions in the courts as might be necessary to protect the rights of the preferred stockholders.

The receivers later presented their petition to the District Court of the United States for the Western District of Pennsylvania, asking that they be appointed ancillary receivers by said court. Under date of March 21, 1930, that court entered an order appointing them ancillary receivers with power and authority to prosecute in the commonwealth of Pennsylvania such suits or actions against Tower Hill of Pennsylvania, its board of directors, or such persons, firms, or corporations as may have had contracts with or may have obtained profits in dealing with Tower Hill of Pennsylvania, to the end that proper decrees be obtained, transferring all money and property from Tower Hill of Pennsylvania to this appellant by way of dividends or otherwise. The ancillary receivers have instituted no proceedings under this order, but appellees claim that they still reserve the right to have the receivers institute proceedings against the officers of appellant personally.

Appellees, on or about July 15, 1930, tendered (but did not formally file until October 26, 1931) an amended and supplemental bill to the District Court of the United States for the Southern District of West Virginia, reaffirming the allegations of the original bill, and, in addition thereto, alleging that, by various acts of fraud, misappropriation, and mismanagement, the assets of appellant had

been reduced to a point where little more remained than would suffice to redeem the outstanding preferred stock at par and the accrued unpaid dividends thereon. It was also alleged that the purpose of the corporation had failed. The amended and supplemental bill prayed (1) that appellant be dissolved; (2) that the business and affairs of the appellant be terminated and wound up and its property and assets sold and converted into money to be applied to the payment of its debts and the overplus distributed among its stockholders according to their respective rights; (3) that receivers be appointed to marshal, sell, and convert the property and assets into money to be distributed pursuant to the orders of the court; and (4) for general relief.

Subsequently, on October 15, 1931, appellees presented a second amended and supplemental bill adopting the allegations of the original bill and of the first amended and supplemental bill, and alleging, in addition thereto, that appellant's directors had illegally and fraudulently expended $1,184,000 of the appellant's cash in the purchase of 11,840 shares of the stock of the Emerald Coal & Coke Company. It was alleged that the Emerald stock was practically worthless, and that its purchase was part of a plan and device to oppress, cheat, and defraud the appellees. It was also alleged that the assets had been further diminished by operating losses and were continuing to decrease at such a rate that soon the assets would not be sufficient to retire the preferred stock at par and pay the accrued unpaid dividends. The prayers of the second amended and supplemental bill were identical with the prayers of the first amended and supplemental bill.

Appellant objected to the filing of both the amended and supplemental bills and moved to dismiss. On October 26, 1931, the court below entered an order overruling appellant's objections to the filing of the amended and supplemental bills and denying appellant's motion to dismiss. Thereupon, appellant filed answer to both amended and supplemental bills and the case was heard. The trial judge filed a memorandum decision, and on August 25, 1932, entered a decree to the effect that the business and affairs of the appellant should be terminated and wound up; that its property and assets be sold and converted into money; that distribution thereof be made to its creditors and stockholders according to their respective priorities; and that receivers designated in the decree be authorized to take such proceedings as would put into effect the decree.

On July 30, 1929, almost immediately following the decision of this court upon the former appeal, all the property and assets of the Eastern Coke Company, in which corporation the Tower Hill of Pennsylvania owned all the stock, were transferred to the Tower Hill of Pennsylvania, as a liquidating dividend. January 8, 1930, while the mandate of this court was still stayed pending appellant's petition, to the Supreme Court of the United States, for a writ of certiorari, the directors of the Tower Hill of Pennsylvania authorized and the directors of Tower Hill of West Virginia accepted the transfer of all the properties and assets of the former to the Tower Hill of West Virginia as a liquidating dividend. The Tower Hill of West Virginia was the sole stockholder of the Tower Hill of Pennsylvania. The Tower Hill of West Virginia thus came into possession of all the property and assets of the Eastern Coke Company and of the Tower Hill of Pennsylvania.

On July 30, 1929, the Tower Hill of Pennsylvania, pursuant to the action of its board of directors, sold to the Redstone Coal & Coke Company, a subsidiary of what is known as the Weirton Steel Company, 48.5 acres of its unmined coal at $2,000 per acre. At the same time Tower Hill of Pennsylvania exchanged approximately 178 acres of unmined coal, together with an electric substation and equipment, for an equal area of unmined coal and the mining facilities constituting what was known as "Thompson No. 1 plant." On September 19, 1930, the Tower Hill of West Virginia leased to the Weirton interests 151.35 acres of its remaining unmined coal at 25 cents per ton, on the basis of an agreed tonnage of 9,000 tons per acre, and sold to Weirton certain personal property connected with the area of the leased coal. It is contended by appellees that the transactions with the Weirton interests were not to the advantage of the Tower Hill of West Virginia, but were made for the personal advantage of the so-called Hillman interests. The evidence shows that, at the time the exchange was made involving the "Thompson No. 1 plant," the Hecla Coal & Coke Company, a majority of the stock of which company was owned by J. H. Hillman & Sons Company, sold certain properties to the Weirton interests. Evidently the taking over of the "Thompson No. 1 plant" by Tower Hill of Pennsylvania was involved in the Hecla-Weirton transaction. This ex-

change was to the distinct disadvantage of the Tower Hill interests, which parted with property of great value, acquiring property it did not need. The "Thompson No. 1 plant" was not, under the evidence, of great value to Tower Hill. This exchange could only have been advantageous to the Hecla Company.

The record shows the complete domination of the Tower Hill of West Virginia, the Tower Hill of Pennsylvania, and the Eastern Coke Company by the Hillman interests. The owner of the controlling stock of the Hecla Company is J. H. Hillman & Sons Company, a corporation of which J. H. Hillman, Jr., is president. He is also president of the Hecla Coal & Coke Company, the Fayette Investment Company, the Thompson Connellsville Coke Company, Tower Hill of Pennsylvania, Eastern Coke, and Tower Hill of West Virginia. The Thompson Connellsville Coke owns in the neighborhood of 28,000 shares of the common stock of the Tower Hill of West Virginia. All these companies have interlocking directorates clearly shown by the record to be under the complete domination of J. H. Hillman, Jr. Since May 3, 1920, J. H. Hillman, Jr., has been president, Thomas Watson, secretary, and R. W. Flenniken, treasurer, of Tower Hill of West Virginia, Thompson Connellsville, Fayette Investment Company, Hecla, and J. H. Hillman & Sons Company. It is impossible to read the record of this cause and not be impressed with the fact that since the acquisition of control by the Hillman interests, on April 28, 1920, the Tower Hill enterprise and all allied corporations have been directed by J. H. Hillman, Jr. It is the atmosphere with which the case is surrounded. The original answer confesses that these corporations "act in harmony toward their common business interests and that J. H. Hillman, Jr., is at their head."

There has been no meeting of the stockholders of the Tower Hill of West Virginia since May 3, 1920, and consequently no election of a board of directors since that time, nor was there any meeting of the board of directors of the Tower Hill of Pennsylvania from November, 1924, to January, 1930. The board apparently had no independent judgment of its own and was merely used by J. H. Hillman, Jr., as a willing instrument to carry out whatever he dictated.

No dividend has been paid upon either the preferred or common stock since the former decision of this court. September 30, 1931, the unpaid cumulative dividends on the pre-ferred stock were $1,814,839 and the total preferred stock liability was $3,139,539.

Notice was given the attorneys for the appellant of the intention to file the first amended and supplemental bill on July 20, 1930, and on July 30, 1930, the Tower Hill of West Virginia bought 11,840 shares of the capital stock of the Emerald Coal & Coke Company, a Delaware corporation owning all the capital stock of the Emerald Coal Company, a Pennsylvania corporation holding a field of undeveloped coal in Greene county, Pa., containing about 10,300 acres. The defendant paid for this stock, which was about ⅕ or 20 per cent. of the total capital stock of the Emerald Company, the sum of $1,184,-000. In order to make this payment it used the money and liquid assets of the defendant company. This purchase and payment was made without any official action of the defendant company. No reference to the Emerald stock purchase is to be found in the minutes of the board of directors of the Tower Hill of West Virginia, until September 19, 1930, and then there was no action approving it, the minutes merely stating that J. H. Hillman, Jr., as chairman of the meeting, reported the transaction. The purchase of the Emerald stock was not approved by the board of directors of Tower Hill of West Virginia until a meeting held October 9, 1931, more than a year after the transaction had been fully consummated. The purchase of the Emerald stock was entered into and carried out without any notice to the plaintiffs, and it did not come to their knowledge until October, 1931, when they at once gave notice of their intention to file their second amended and supplemental bill.

This was a highly speculative venture, to say the best of it, and the action of the defendant can be explained only on the hypothesis that the Hillman interests recognized that they had little equity in the defendant corporation and were willing to tie up its assets in the Emerald purchase on the chance of increasing the value of their common stock if this venture should prove successful. It is significant, also, that the purchase of the Emerald stock was coupled with a transaction in which J. H. Hillman, Jr., transferred an option on the Edwards mine to the Emerald, and that Emerald purchased the Edwards mine as a part of the same transaction in which Hillman subscribed to the stock.

The court below, in which this litigation had been pending for a number of years, and in which receivers had been appointed to bring suit looking to an investigation of the

management of the Tower Hill Companies, was not consulted or advised with regard to this transaction which used up a large portion of the liquid assets of the defendant company. The original option in the Emerald transaction was taken in the name of J. H. Hillman, Jr., personally, and the defendant company had notice of plaintiffs' first amended and supplemental bill seeking the winding up of the affairs of Tower Hill of West Virginia before any money was paid out by Tower Hill of West Virginia on account of the Emerald stock.

Since the former decision of this court, the record shows that the Tower Hill properties have lost a great deal of money. Conditions in the coal business have been deplorable. It was contended on the former hearing that the surplus of the Tower Hill Company of Pennsylvania could not be paid out as preferred stock dividends, because it was needed to protect the company, as a going concern. In the year 1929, attorneys representing defendant contended that investments in coal were not at that time looked upon with favor, yet in the face of the admittedly worse conditions that existed in 1930 we find those in control of Tower Hill of West Virginia making this large investment in the stock of a company that had never been active, had never paid dividends, and whose sole asset was a dormant tract of coal land necessitating a large expenditure for upkeep, taxes, etc. There is conflict in the evidence as to the ultimate value of the coal tract held by the Emerald Company, but the transaction, which was evidently made to prevent payment of any dividends on the preferred stock, can only be explained by the admission made by counsel for appellant in the argument before us that "bad blood" existed. As pointed out in our former decision with regard to other contemplated investments, the purchase of the Emerald stock was made with money to which the preferred stockholders, under the provisions under which the preferred stock was issued, had, in equity, first claim. If the Emerald transaction turned out to be a profitable one, the preferred stockholders, whose money it really was that was used, could not profit greatly, as practically all the gain would go to the common stockholders over and above the limited dividend to be paid on the preferred stock. If the transaction turned out to be a losing one, all the loss would be borne by the preferred stockholders.

Those purchasing the preferred stock were undoubtedly influenced to do so by the provisions concerning that stock set out in the certificate of incorporation of the Tower Hill of West Virginia which provided as follows:

"The corporation shall not be at liberty, without the consent in writing first obtained of the holders of two thirds in amount of the preferred stock issued and outstanding:

"(a) To create or issue any other or further shares ranking in any respect pari passu with or in priority to the aforesaid issue of one million, five hundred thousand dollars, par value, of preference shares.

"(b) Nor to create any charge except as hereinafter provided upon the net profits of the corporation which shall be detrimental to the rights of the preference shares.

"(c) Nor to reserve a surplus fund which shall not be chargeable with the payment of the accrued dividends upon the preference shares."

The record further discloses the fact that it is practically certain that the financial condition of the company is such, taking into consideration the condition of the coal business, that the Tower Hill of West Virginia, if liquidated now, would not pay its debts and preferred stock obligations, inclusive of principal and deferred dividends.

There can be no doubt that, if the court below, where litigation was pending with regard to the very assets used in purchasing the Emerald stock, had been advised as to the proposed purchase of the Emerald stock, it would not have sanctioned it, and upon proper application would have enjoined its consummation.

J. H. Hillman, Jr., the dominating influence in the Tower Hill Companies, testified at the first hearing of this cause, but not at the later hearing, and has made no attempt to explain any of the transactions detailed as occurring since the former decision of this court.

The record discloses the fact that the common stock of the Tower Hill of West Virginia, as originally issued, represented no actual money invested, but was what is commonly known as "water." The real investment in the company was represented by the bonds and preferred stock. The Tower Hill operation had gone through a receivership, but had recovered from that and was in a very prosperous condition when the Hillman interests secured control in April, 1920. At the time of the last hearing in the court below, the operation was again showing a bad condition. And from the last statement shown in the record it is plain that the as-

sets of the Tower Hill of West Virginia are hardly more than sufficient to take care of the preferred stock liability, which is to be first paid in case of dissolution.

Of the original 2,000 acres of coal land, only 444 acres remain, and this remaining acreage is not so advantageously situated as to give hope of a continuation of the business of the company with respect to this tract, at any profit. The company has run its course as originally planned. While it was empowered, under the general provisions of its charter, to do many things, the real object for which it was incorporated, and to accomplish which the preferred stockholders invested their money, to wit, the development of the original tract of 2,000 acres of coal land, has been accomplished. The corporation was organized to develop a certain tract of coal land. It was organized more than a quarter of a century ago. A part of the coal land has been developed, the mortgage indebtedness has been paid off, and the paying coal lands have been sold and transferred to other parties. The original enterprise seems to be at an end, and the company has left on its hands three developments of little value for coal operations, which are standing idle and eating themselves up with maintenance charges. It is to be remembered that the preferred stock carries cumulative dividends, and the value of the preferred stock, plus the accrued dividends, will practically cover all the assets that the corporation possesses. It seems to us that in equity and good conscience these preferred stockholders, who have waited twenty-five years for dividends and during this whole period have received only 10 per cent., should have this enterprise wound up and the assets sold and the proceeds disbursed. To continue the enterprise is to allow those who have been in control many years, and who have been wrongfully withholding from the preferred stockholders their rightful dividends, to speculate on the chance of making something in the future, when their efforts may result in the loss of the rights of the preferred stockholders and when it clearly appears that the common stock has little, if any, equity in the assets. In equity, good conscience, and common honesty, the affairs of this corporation ought to be wound up and its assets distributed.

The judge below, after taking a great mass of testimony, found as a fact that the value of the assets of the defendant company have steadily decreased since the bringing of this suit, under its present management; that this decrease in the value of the assets is so great as to imperil the rights, under the charter of the company, of the preferred stockholders; that the result of the management of the Tower Hill Company for the last ten years, preceding the entry of the decree appealed from, has been to imperil those rights; that the security of the preferred stockholders, both as to accumulated dividends on the preferred stock and the value of the stock itself, has been impaired by the management to such an extent that "there is very grave doubt whether, within a short time, anything could be salvaged from such assets," and that the expense, including taxes, interest, loss by operation and other items, is apparently so great as to indicate a practically total loss in the near future.

It is strongly contended on behalf of the appellant that the transfer of the assets of the Eastern Coke Company and the Tower Hill of Pennsylvania to the Tower Hill of West Virginia was in no sense an effort to avoid the effect of the former decision of the court below and of this court. We cannot agree with this contention. After the decision of this court to the effect that the plaintiffs were entitled to real relief, and that a receiver should be appointed to prosecute the matter in the courts of Pennsylvania where the parties who controlled and dominated the Tower Hill Companies were domiciled, and while the mandate of this court, putting into effect this finding, was stayed by the application to the Supreme Court for a writ of certiorari, action was taken by those in control of the defendant company that rendered futile and useless anything that the receivers might do in Pennsylvania with respect to these particular assets. The transfer of the assets in question to the West Virginia corporation was with an evident intent to raise the technical questions in this case that would defeat the granting of the relief which this court had said the plaintiffs were entitled to seek. We are not impressed with the argument that the transfer of these assets was in effect bringing them under the jurisdiction of the court below, when in the same breath it is strenuously contended that the court below has neither the jurisdiction because of the lack of indispensable parties, nor the power if it had the jurisdiction, to grant the plaintiffs the relief to which they are clearly entitled.

We find ourselves in agreement with the conclusion of the court below as to the facts. The continued policy of those dominating the Tower Hill Companies in so managing the affairs of the companies as to trample upon, in a ruthless manner, the rights of the

preferred stockholders, and to injure and destroy whatever value their preferred stock may possess, is clearly proven by the record, and evidences such an abuse of power as constituted a fraud upon the rights of the preferred stockholders. If, as we said in our former decision, "it would be indeed strange if the plaintiffs were not given some adequate relief," it would be still more strange if, after the occurrence of the events happening since our former decision, the plaintiffs were yet not given relief. The Emerald transaction alone proves conclusively the utter disregard, on the part of those dominating the Tower Hill of West Virginia, of the rights of the preferred stockholders, and a deliberate intention to trample upon those rights. Unless the "arm of equity be shortened or palsied" it can certainly reach the trouble here and give to the plaintiffs that relief to which they are clearly entitled.

■ Transactions between corporations having interlocking directorates, the fairness and good faith of which transactions are challenged, are jealously regarded by the law, and those who would sustain them must show their entire fairness. As was said by Judge Soper of this court in Finefrock v. Kenova Mine Car Co., 22 F.(2d) 627, 632: "The rule is that the relation of directors to corporations is of such a fiduciary nature that transactions between boards, having common members, are regarded as jealously by the law as personal dealings between a director and his corporation. Where the fairness of such transactions is challenged, the burden is upon those who would maintain them to show their entire fairness. The Supreme Court has been consistently emphatic in the application of the rule, and has declared it to be founded upon the soundest morality and the soundest business policy. Geddes v. Anaconda Mining Co., 254 U. S. 590, 599, 41 S. Ct. 209, 65 L. Ed. 425. See, also, Hulings v. Hulings Lumber Co., 38 W. Va. 351, 18 S. E. 620, Sweeny v. Grape Sugar Refining Co., 30 W. Va. 443, 4 S. E. 431, 8 Am. St. Rep. 88."

It is contended on behalf of appellant that the court below had no jurisdiction to give the relief to which the plaintiffs are entitled under the finding of facts, mainly, for two reasons: (1) That necessary and indispensable parties (to wit, officers, directors, and common stockholders of the defendant company) were not joined as defendants and their joinder would oust the court below of its jurisdiction. (2) That a court of equity is without inherent jurisdiction to dissolve and wind up affairs of the defendant corporation. Both these points were strongly urged and the propositions of the appellant ably presented in the briefs and argument before this court.

■ On the first point as to the absence of indispensable parties we held, in our former decision, that, for the purpose of appointing receivers with authority to go into Pennsylvania and there sue, the defendant corporation itself was the only indispensable party. When receivers were appointed and about to proceed in the courts in Pennsylvania, by its own act, the defendant transferred the assets of the Tower Hill of Pennsylvania to the West Virginia corporation, thereby defeating the very purpose of the receivership decreed by this court. Can it now be said that by this act, deliberately studied as it undoubtedly was, the effect of the former decisions of this and the lower court can be flaunted, disregarded, and nullified? We think not.

As was said by the Supreme Court in Niles-Bement-Pond Co. v. Iron Moulders' Union, 254 U. S. 77, 41 S. Ct. 39, 65 L. Ed. 145, there is no prescribed formula for determining in every case who are the indispensable parties, but the description most generally approved by the Supreme Court is that given in Shields v. Barrow, 17 How. 130, 139, 15 L. Ed. 158, which is as follows: "Persons who not only have an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience."

Here the rights and interest of all the stockholders, both preferred and common, are fully protected by the appearance of the corporation which represents them and by their right to be heard in such distribution of the property and assets as will be finally decreed by the court. This principle is enunciated by Mr. Justice Peckham, in New Orleans Debenture Company v. Louisiana, 180 U. S. 320, 21 S. Ct. 378, 382, 45 L. Ed. 550, where the court said:

" * * * We are of opinion that for the purpose of obtaining a decree declaring the charter void and restraining the officers from acting as a corporation, the state through its attorney general was a proper party to bring the action, and for the reasons stated it was well brought against the corporation alone and the final injunction was properly issued. * * *

"Then as to the rights of the individual

corporators. Has their property been in any way taken without due process of law by this decree? Clearly it has not. * * *

"There has been no taking of any property belonging to shareholders, and whatever may be done hereafter, whether by liquidator or receiver, can only be done upon notice to them, as parties to the action and after full hearing of their claims. * * *"

█ The judge below in the decree complained of has only said that the defendant's business shall no longer continue, dominated and controlled as it is, and that its affairs shall be wound up. For the purposes of this decree under the circumstances here existing, we are of the opinion that the defendant is the only indispensable party. As under the decree defendant's assets come into the possession of the receivers, and the distribution is to be made according to the rights of the creditors and stockholders, the proceeding will be one in aid of the main suit, and all parties will have notice and will be afforded full opportunity to be heard on all questions arising as to such distribution. Diversity of citizenship will not then be involved. Ross v. Miller (C. C. A.) 252 F. 697; Central Union Trust Co. v. Anderson County, 268 U. S. 93, 45 S. Ct. 427, 69 L. Ed. 862.

In Wallace v. Motor Products Corporation (C. C. A.) 25 F.(2d) 655, it was held that in an attack upon the existence of a corporation the stockholders and directors were in no sense necessary parties.

"The general rule unquestionably is, that where some right is sought to be enforced against a corporation, and the relief asked will only affect the stockholders as stockholders, and no discovery nor relief is sought against them as individuals, then they are unnecessary parties to a bill in chancery.

"Treating the petition as a bill, and testing the question by this general rule, the stockholders were not indispensable parties to the proceeding, for the petition neither seeks discovery nor relief against the stockholders. The only way in which they are affected by the proceeding is in their character as stockholders, and in that character, where nothing is required of them personally, they are sufficiently represented by the corporation itself,—hence the general rule is, that judgments and decrees are at least prima facie binding on the corporators or stockholders." Ward v. Farwell, 97 Ill. 593.

This subject is treated in Fletcher's Cyclopedia on Private Corporations, and he says in paragraph 5561: "The corporation is a necessary party to the suit. And all the stockholders are necessary parties to a bill for dissolution of a corporation unless it is shown that it is practically inconvenient to make them parties or that their interests are adequately represented."

Here it is not only inconvenient to make the stockholders parties, but to do so would defeat the jurisdiction of the court; and surely it could not be said by any one who studied the briefs, and heard the oral argument on appeal, that their interests have not been adequately represented.

█ We have here no desire of stockholders to escape the consequence of their stock purchase or subscription for private reasons of their own, nor desire to withdraw from a bad bargain, but an earnest effort by these plaintiffs to rescue at least some part of their investment from an arbitrary, unjust, and tyrannical domination by a ruthless majority— a majority that acts entirely without regard to that trust relationship that exists between a controlling majority and a minority in a stock company. While the controlling majority are not to be deemed trustees in any technical sense, they have a real duty to protect the interests of the minority when they undertake to run a corporation without giving them (the minority) a voice in its management. The law governing the control of corporations by a majority of stockholders is based upon fair dealing and a proper conduct of the affairs of a corporation with due respect to the rights of the minority by those in control. These elements of justice we do not find in this case.

In Allied Chemical & Dye Corporation v. Steel & Tube Company of America, 14 Del. Ch. 1, 120 A. 486, 491, the fiduciary character of the relationship has been aptly stated as follows: " * * * No one, of course questions the fiduciary character of the relationship which the directors bear to the corporation. The same considerations of fundamental justice which impose a fiduciary character upon the relationship of the directors to the stockholders will also impose, in a proper case, a like character upon the relationship which the majority of the stockholders bear to the minority. When, in the conduct of the corporate business, a majority of the voting power in the corporation join hands in imposing its policy upon all, it is beyond all reason and contrary, it seems to me, to the plainest dictates of what is just and right, to take any view other than that they are to be regarded as having placed upon themselves the same sort of fiduciary character which the law impresses upon the direc-

tors in their relation to all the stockholders. Ordinarily the directors speak for and determine the policy of the corporation. When the majority of stockholders do this, they are, for the moment, the corporation. Unless the majority in such case are to be regarded as owing a duty to the minority such as is owed by the directors to all, then the minority are in a situation that exposes them to the grossest frauds and subjects them to most outrageous wrongs."

Nor is this a conflict between different classes of stockholders as is contended by appellant and as was the case in Baltimore, C. & A. R. Co. v. Godeffroy (C. C. A.) 182 F. 525.

"It is contended for appellant that the case presented in the bill is one in which there is a contest between classes of stockholders (the common stockholders on one hand and the preferred stockholders on the other), in which the corporation is presumptively indifferent, as in Taylor & Co. v. Southern Pacific Co. (C. C.) 122 F. 147, Weidenfeld v. Northern Pacific R. Co. (C. C. A.) 129 F. 305, and Baltimore, C. & A. R. Co. v. Godeffroy (C. C. A.) 182 F. 525. With this we cannot agree. Against the corporate defendant, the plaintiff sought an annulment of its charter, with incidental injunctional relief pending a hearing and decision of that main issue. This was an attack upon the existence of the corporation in which it was vitally interested, which it had to defend, and to which the stockholders and directors were in no sense necessary parties. It was clearly separable from the claim of damages against the individual defendants for acts which they did as directors and stockholders of the old corporation, in which the new corporation was not interested, and to which it could not be required to respond." Wallace v. Motor Products Corp. (C. C. A.) 25 F.(2d) 655, 657.

Some of the plaintiffs are owners of the common stock as well as of preferred stock, and there is no issue between the two classes of stock, the rights of each class being clearly defined and admitted. The issue is between the stockholders, and the corporation as managed. In view of this fact the cases relied upon by appellant as holding that where there is a contest between different classes of stockholders the classes so involved became necessary parties to the litigation are not controlling.[1]

In this case the action of which the plaintiffs have reason to complain is the action of the corporation. This action, while controlled by the majority of the stockholders, is the act of the corporation, and not their action, and relief is asked against the corporation and not against them. No rights of theirs will be affected by the action of the court, but only the rights of the corporation. After dissolution is decreed, they can come in and receive the portion of the assets belonging to them and make themselves parties to the suit pro hac vice, but this does not defeat the jurisdiction, for this is what happens in every receivership case.

Upon the second point relied upon by the appellant, that a court of equity has no power to decree the winding up of the affairs of the corporation, an examination of the authorities shows some conflict, but there is no conflict where conditions at all approaching the extremely aggravated condition that existed here are considered.

As said by Mr. Justice Brewer, when sitting at Circuit Court, as quoted in Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co., 54 F. 746, 751, 19 L. R. A. 395: "I believe most thoroughly that the powers of a court of equity are as vast, and its processes and procedure as elastic, as all the changing emergencies of increasingly complex business relations and the protection of rights can demand."

In discussing the general rule that a court of equity will not ordinarily wind up the affairs of a solvent corporation at the suit of minority stockholders, it is said in Pomeroy's Equity Jurisprudence, Fourth Edition, § 1540: "A few exceptions have, however, been admitted to this rule; as, where the corporation had utterly failed of its purpose, because of fraudulent mismanagement and misappropriation of its funds by the president and manager, who owned a majority of its stock, a receiver was appointed to wind up its affairs at the suit of a minority stockholder; and it has been held, even in New York, that a court of equity has inherent power to appoint a receiver on the application of a stockholder for the purpose of the equitable distribution of the assets of an insolvent corporation, without regard to the statutory provisions for the dissolution of corporations, where the directors refuse to institute statutory proceedings for a voluntary dissolution, and there is danger of the

---

[1] Among others, the following cases are relied upon by appellant upon this point: Baltimore, C. & A. Ry. Co. v. Godeffroy (C. C. A.) 182 F. 525; Hamlin v. Toledo, St. L. & K. C. R. Co. (C. C. A.) 78 F. 664, 36 L. R. A. 826; Weidenfeld v. Northern Pacific Ry. Co. (C. C. A.) 129 F. 305; Taylor v. Southern Pacific Co. (C. C.) 122 F. 147; and Watson v. U. S. Sugar Refinery (C. C. A.) 68 F. 769.

assets being absorbed by judgments that will be recovered, so as to render an application to the attorney general useless. In a recent case in the United States circuit court for the eastern district of North Carolina the court even went to the length of appointing a receiver for the purpose of the dissolution of a solvent and prosperous corporation, and the sale of its property, for the sole reason, apparently, that this action was desired by a majority of the stockholders, and that a minority stockholder was threatening to procure the passage of a bill by the state legislature forfeiting the charter of the corporation."

In a footnote to this same section (section 1540) the case of Miner v. Belle Isle Ice Co., 93 Mich. 97, 53 N. W. 218, 223, 17 L. R. A. 412, is referred to approvingly as a well-considered case. In that case the court said:

"The general rule undoubtedly is that courts of equity have no power to wind up a corporation, in the absence of statutory authority. This rule is, however, subject to qualifications. It has been held that, when it turns out that the purposes for which a corporation was formed cannot be attained, it is the duty of the company to wind up its affairs; that the ultimate object of every ordinary trading corporation is the pecuniary gain of its stockholders; that it is for this purpose, and no other, that the capital has been advanced; and if circumstances have rendered it impossible to continue to carry out the purpose for which it was formed with profit to its stockholders, it is the duty of its managing agents to wind up its affairs. To continue the business of the company under such circumstances would involve both an unauthorized exercise of the corporate franchises and a breach of the charter contract. Mor. Corp. 217—407. The rule applicable in cases of a copartnership has been held to apply in case of a corporation or joint-stock company. In re Suburban Hotel Co., L. R. 2 Ch. App. 737. * * *

" 'They err if they suppose that a court of equity will tolerate a discretion which does not consult the interests of the minority. * * * But it is also of the essence of the contract that the corporate powers shall only be exercised to accomplish the objects for which they were called into existence, and that the majority shall not control those powers to pervert or destroy the original purposes of the corporators;' citing Livington v. Lynch, 4 Johns, Ch. [N. Y.] 573; Hutton v. Scarborough Cliff Hotel Co., 2 Drew & S. 514; Brewer v. Boston Theatre, 104 Mass.

378; Kean v. Johnson, 9 N. J. Eq. 401; Rollins v. Clay, 33 Me. 132; Clinch v. Financial Corp., L. R. 4 Ch. App. 117; Clearwater v. Meredith, 1 Wall. 25 [17 L. Ed. 604].

"When a number of stockholders combine to constitute themselves a majority in order to control the corporation as they see fit, they become, for all practical purposes, the corporation itself, and assume the trust relation occupied by the corporation towards its stockholders. Although stockholders are not partners, nor strictly tenants in common, they are the beneficial joint owners of the corporate property, having an interest and power of legal control in exact proportion to their respective amounts of stock. The corporation itself holds its property as a trust fund for the stockholders, who have a joint interest in all its property and effects, and the relation between it and its several members, is for all practical purposes, that of trustee and cestui que trust. Peabody v. Flint, 6 Allen [Mass.] 52–56; Hardy v. Land, etc., Co., L. R. 7 Ch. App. 427; Stevens v. Railroad Co., 29 Vt. 550. When several persons have a common interest in property, equity will not allow one to appropriate it exclusively to himself, or to impair its value to the others. Community of interest involves mutual obligation. Persons occupying this relation towards each other are under an obligation to make the property or fund productive of the most that can be obtained from it for all who are interested in it; and those who seek to make a profit out of it, at the expense of those whose rights in it are the same as their own, are unfaithful to the relation they have assumed, and are guilty, at least, of constructive fraud. Jackson v. Ludeling, 21 Wall. 616–622 [22 L. Ed. 492]; Story, Eq. 323. In Dodge v. Woolsey, 18 How. [59 U. S.] 331 [15 L. Ed. 401], Wayne J., says: 'It is now no longer doubted, either in England or the United States, that courts of equity in both have a jurisdiction over corporations, at the instance of one or more of their members, to apply preventive remedies by injunction, to restrain those who administer them from doing acts which would amount to a violation of charters, or to prevent any misapplication of their capital or profits, which might result in lessening the dividends of stockholders or the value of their shares, as either may be protected by the franchises of a corporation, if the acts intended to be done create what is in the law denominated a breach of trust. And the jurisdiction extends to inquire into, and to enjoin, as the case may require that to be done,

any proceedings by individuals, in whatever character they may profess to act, if the subject of complaint is an imputed violation of a corporate franchise, or the denial of a right growing out of it, for which there is not an adequate remedy at law. * * * It is not only illegal for a corporation to apply its capital to objects not contemplated by its charter, but also to apply its profits.' * * *

"The present case furnishes an instance of gross abuse of trust. Must the cestui que trust be committed to the domination of a trustee who has for seven years continued to violate the trust? The law requires of the majority the utmost good faith in the control and management of the corporation as to the minority. It is of the essence of this trust that it shall be so managed as to produce for each stockholder the best possible return for his investment. The trustee has so far absorbed all returns. What is the outlook for the future? This court, in view of the past, can give no assurances. It can make no order that can prevent some other method of bleeding this corporation, if it is allowed to continue. * * * I think a court of equity, under the circumstances of this case, in the exercise of its general equity jurisdiction, has the power to grant to this complainant ample relief, even to the dissolution of the trust relations. Complainant is therefore entitled to the relief prayed. A receiver will be appointed, and the affairs of this corporation wound up."

We quote at length from this latter case because it lays down the principles that should in our opinion control the present case in a sound and unanswerable statement of the law.[2]

A discussion of the question of the power of a court of equity to control the action of a majority on a question of dividends is found in Dodge v. Ford Motor Co., 204 Mich. 459, 170 N. W. 668, 3 A. L. R. 413, where it was held that the Ford Motor Company could be compelled to declare dividends on the petition of minority stockholders.

[2] Among other cases holding to the same effect as the Miner Case are: O'Neil v. Welch (C. C. A.) 245 F. 261; Klein v. Wilson & Co., Inc. (D. C.) 7 F.(2d) 772; Carson v. Allegheny Window Glass Company (C. C.) 189 F. 791; Sellman v. German Union Fire Insurance Company (C. C.) 184 F. 977; Ames v. Goldfield Merger Mines Co. (D. C.) 227 F. 292; U. S. Shipbuilding Co. v. Conklin (C. C. A.) 126 F. 132; Goodwin v. Von Cotzhausen, 171 Wis. 351, 177 N. W. 618; Brent v. Brister Saw Mill Co., 103 Miss. 876, 60 So. 1018, 43 L. R. A. (N. S.) 720, Ann. Cas. 1915B, 576; Green v. National Advertising & Amusement Co., 137 Minn. 65, 162 N. W. 1056, L. R. A. 1917E, 784; Hall v. City Park Brewing Co., 294 Pa. 127, 143 A. 582; Red Bud Realty Company v. South, 153 Ark. 380, 241 S. W. 21.

Here those in control of the Tower Hill of West Virginia refused to declare dividends on the preferred stock to which that stock was clearly entitled, while at the same time preferred stock was being bought by the corporation and canceled. Such a course evidently resulted in lowering the value of the preferred stock to the unfair advantage of the common stockholders.

"If a majority of the shareholders or the directors of a corporation wrongfully refuse to declare a dividend and distribute profits earned by the company, any shareholder feeling aggrieved may obtain relief in a court of equity.

"It may often be reasonable to withhold part of the earnings of a corporation in order to increase its surplus fund, when it would not be reasonable to withhold all the earnings for that purpose. The shareholders forming an ordinary business corporation expect to obtain the profits of their investments in the form of regular dividends. To withhold the entire profits merely to enlarge the capacity of the company's business would defeat their just expectations." 1 Morawetz on Corporations (2d Ed.) § 447.

We are convinced, from a study of the authorities, that the court below had the power, under conditions here shown by the record, to enter the decree complained of.

Appellant contends that the court is without jurisdiction to enter the decree because of the West Virginia statute. Section 57, chapter 53 of the Code of West Virginia, reads as follows: "If not less than one-fifth in interest of the stockholders of a corporation desire to wind up its affairs, they may apply by bill in chancery to the circuit court of the county in which the principal office or place of business of such corporation is situated, * * * setting forth in the bill, the grounds of their application, and the court may thereupon proceed according to the principles and usages of equity to hear the matter, and if sufficient cause therefor be shown, to decree a dissolution of the corporation, and make such orders and decrees, and award such injunctions in the cause as justice and equity may require."

This statute points a way in which a dissolution of a corporation may be brought about, but it does not provide that it may not be brought about in a proper proceeding in any other way. The remedy given by the statute is not an exclusive one and does not prevent a federal court of equity from entering a decree which, while it winds up the

affairs of the company, does not specifically cancel the charter. The decree of the court is not in conflict with the provisions of the statute. If a state statute creates a substantive equitable right, a federal court of equity may enforce it. Holland v. Challen, 110 U. S. 15, 3 S. Ct. 495, 28 L. Ed. 52; Reynolds v. First National Bank of Crawfordsville, Ind., 112 U. S. 405, 5 S. Ct. 213, 28 L. Ed. 733; Louisville & N. R. R. Co. v. Western Union Telegraph Company, 234 U. S. 369, 34 S. Ct. 810, 58 L. Ed. 1356; Land T. & T. Co. v. Asphalt Co. (C. C. A.) 127 F. 1; Southern Pine Co. v. Hall (C. C. A.) 105 F. 84; Kessler v. William Necker, Inc. (D. C.) 258 F. 654.[3]

■ But a state statute cannot affect proceedings in federal courts sitting in equity, and the jurisdiction of such a court cannot be enlarged or narrowed by a procedural state statute. Pusey & Jones Co. v. Hanssen, 261 U. S. 491, 43 S. Ct. 454, 67 L. Ed. 763; Willing v. Chicago, etc., Ass'n, 277 U. S. 290, 48 S. Ct. 507, 72 L. Ed. 880; Henrietta Mills v. Rutherford County, North Carolina, 281 U. S. 121, 50 S. Ct. 270, 74 L. Ed. 737.

■ And we think the court had jurisdiction to proceed in the pending suit upon the filing of an amended and supplemental bill and that it was not necessary that an independent suit be instituted. Having taken jurisdiction over a portion of the controversy between the parties by its former order, made pursuant to the decision of this court, it had not only the right, but it was its duty, to decide all issues and award complete relief. As was said by Mr. Chief Justice Taft, in Hartford Accident Company v. Southern Pacific, 273 U. S. 207, 47 S. Ct. 357, 360, 71 L. Ed. 612:

"Where a court of equity has obtained jurisdiction over some portion of a controversy, it may, and will in general, proceed to decide all the issues and award complete relief, even where the rights of parties are strictly legal, and the final remedy granted is of the kind which might be conferred by a court of law. I Pomeroy's Equity Jurisdiction (4th Ed.) §§ 181 and 231; United

[3] Among the cases relied upon by appellant to sustain the view that the court was without jurisdiction to enter such a decree are the following: Lyon v. McKeefrey (C. C. A.) 171 F. 384; Law v. Rich, 47 W. Va. 634, 35 S. E. 858; Hirsch v. Steel Co. (C. C.) 196 F. 104; Conklin v. U. S. Shipbuilding Co. (C. C.) 140 F. 219; Brictson Mfg. Co. v. Close (C. C. A.) 280 F. 297; Olds v. City Trust Co., 185 Mass. 500, 70 N. E. 1022, 102 Am. St. Rep. 356; Republican Co. v. Brown (C. C. A.) 58 F. 644, 24 L. R. A. 776; Sidway v. Missouri Co. (C. C.) 101 F. 481; Pearce v. Sutherland (C. C. A.) 164 F. 609; In re Electric Supply Co. (D. C.) 175 F. 612.

States v. Union Pacific Railway, 160 U. S. 1, 52, 16 S. Ct. 190, 40 L. Ed. 319. See, also, equity rule 10, amended May 4, 1925, 268 U. S. 709, appendix."

"Equity, having taken jurisdiction for one purpose, will hear all issues."

If the receivers appointed to bring suit against the Pennsylvania corporation had succeeded in recovering funds by way of dividends for the West Virginia corporation, there can be no question but that the court, upon the refusal of the receiver of the latter corporation to declare dividends to its stockholders, would in the pending action grant the necessary relief and direct the distribution of the fund obtained by way of dividends. We do not think that the power of the court to afford relief is impaired by reason of the fact that the entire assets of the Pennsylvania corporation, and not merely a fund set aside for the payment of dividends, has been transferred to the West Virginia corporation. When it appeared that the majority stockholders were continuing to abuse their power and were controlling the assets in a manner which threatened the destruction of the interests of the minority, it was the duty of the court in the pending suit to grant adequate relief, even though this involved the winding up of the affairs of the corporation.

■ It is contended on behalf of appellant that the judge below was in error in allowing plaintiffs' first and second amended and supplemental bills to be filed. Under Equity Rule 34 (28 USCA § 723) this was a question within the discretion of the trial judge. Hardin v. Boyd, 113 U. S. 756, 5 S. Ct. 771, 28 L. Ed. 1141. We do not think the judge below abused his discretion, but that his action was proper.

A tangled web has been woven by the interests dominating the defendant company. Interlocking directorates, holding companies, straw directors carrying out without independent judgment, the directions of the dominating mind, all go to present a problem difficult of solution. The withholding of dividends that should have been paid on stock held by the plaintiffs, while at the same time purchasing and retiring preferred stock; the alleged purpose, in withholding such dividends, of creating a reserve for building of a coking plant, since abandoned; the deliberate refusal to hold a stockholders meeting or to give an opportunity to elect a new board of directors; the proposed merger with Eastern Coke, later abandoned; the transfer of all the assets, of Eastern Coke and Tower

Hill of Pennsylvania, to Tower Hill of West Virginia, while the mandate of this court was stayed pending the application to the Supreme Court; the Weirton transactions; and finally, and most significant of all, the purchase of the Emerald stock, without notice to, or consultation with, those whose money was taken to make the purchase—all these acts paint a vivid picture of a deliberate disregard of plaintiffs' rights.

Tangled and intricate as is this Gordian knot surely the sword of justice wielded by the puissant arm of the Chancellor can cut it.

For the reasons stated we think that the decree of the court below was correct. . It does not, of course, revoke the charter of the defendant corporation or prevent the stockholders from proceeding under that charter, if they desire to do so, after plaintiffs have received their proper portion of the corporate assets. A distribution of these assets is necessary to afford adequate relief to plaintiffs, and the fact that after the distribution of assets there may be no incentive to proceed, and the charter will probably be abandoned, is no reason to deny to plaintiffs the protection to which they are entitled.

The decree of the court below is affirmed.